## HAYS *v.* UNITED STATES.

### APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 19. Argued October 10, 1899. — Decided December 4, 1899.

Under the laws of Mexico prior to 1848, an alcalde had no power to make a grant of public lands.

Where petitioner produced oral testimony tending to show a grant of lands by the governor of New Mexico, and an order upon the alcalde to put the grantee in possession; and also gave evidence tending to show that these documents were afterwards lost or destroyed, and at the same time produced a grant by the alcalde in which no reference whatever was made to a prior grant by the governor, it was *held* that the grant of the alcalde was inconsistent upon its face with the alleged grant by the governor, and with the other circumstances in the case, and that the claim was properly rejected by the Court of Private Land Claims.

Possession to land since the treaty of Guadalupe Hidalgo, in 1848, will not of itself give a valid title to land; nor will it create the presumption of a valid grant where a void grant appears to have been made; or in case the surrounding circumstances are incompatible with the existence of a valid grant.

THIS was a suit instituted by the appellant in the Court of Private Land Claims for the confirmation of a grant of land situate in the county of San Miguel, New Mexico, known as

the "Apache Springs," or "Ojo del Apache" grant, and alleged to contain eleven square leagues, or 47,743 square acres.

The amended petition alleged, substantially, that prior to June 2, 1842, Manuel Armijo, then governor of New Mexico, granted the tract in question to Venturo Trujillo, in accordance with his petition for the same, and by decree directed the constitutional alcalde of the demarcation of San Miguel del Bado to place the petitioner in possession; that said alcalde subsequently made return that he had placed the petitioner in juridical possession of the lands as directed, and that this return with the original papers were duly deposited in the archives of New Mexico.

Petitioner further alleged that he had neither the original of said petition, nor a copy thereof, nor the decree of the governor, nor the return of the alcalde, in his possession; and that neither of them is in the possession of the surveyor general of New Mexico; but he alleged that the archives of New Mexico, previous to the occupation of the Territory by the United States, and for some time thereafter, were kept carelessly, and many of the papers and documents, including those therein mentioned, were lost and destroyed; and prayed that he might be permitted to give secondary evidence of the petition, decree and order of the governor, and of the return of the alcalde.

He further alleged that on July 2, 1842, Damasio Salazar, a justice of the peace of the demarcation of San Miguel del Bado, now embraced within the limits of the county of San Miguel, acting in conformity with the laws and customs of Mexico, placed Venturo Trujillo in possession of the tract so granted; that he entered into such possession and occupied the same for about four years from July, 1842, and that, by sundry mesne conveyances from him to parties who continued such possession, the petitioner, by virtue of the original grant and these mesne conveyances, now claims the ownership of the whole of said tract; and that ever since the year 1842, and at the present time, the said grantee, Venturo Trujillo, and his legal representatives and those claiming under him and them, have held, claimed, used and

occupied, owned and grazed upon, peaceably and notoriously, the whole of said lands.

That no survey of the tract has ever been made; that petitioner cannot state the amount, but that it does not exceed eleven leagues; that one Taylor, who was then the owner of the grant and one of the mesne grantees, made application to the surveyor general of New Mexico for the approval of said grant under the law of July 22, 1854, which was rejected December 19, 1872, upon the ground that the grant was made by a justice of the peace, who, under the laws of New Mexico, had no power to make a grant of lands; that subsequently, and upon September 22, 1873, application was made to the surveyor general to reopen the application for confirmation, and to receive new testimony which had been discovered. The application was granted, so far as to permit the new testimony to be introduced, and the depositions of Guadalupe Miranda, secretary of New Mexico during the adminstration of Governor Armijo, and of Rafael Aragon, secretary of Damasio Salazar, the constitutional alcalde who placed Trujillo in possession, were taken and made a part of the petition. The application was again rejected by the surveyor general upon the ground that the depositions being based entirely upon memory were insufficient to establish a grant by the governor; that Miranda and Aragon are now dead; that the grant has, since July, 1842, remained in the possession of the grantee and his assigns, and has been generally recognized.

No question was made with regard to the intermediate conveyances to the petitioner or of the other formal allegations bringing the case within the provisions of the act establishing the Court of Private Land Claims.

The case was tried by the court upon the pleadings and evidence, the claim rejected, and the petition dismissed by a majority of the court. Petitioner thereupon appealed to this court.

*Mr. T. B. Catron* for appellant.

*Mr. William H. Pope* for appellee. *Mr. Solicitor General* and *Mr. Matthew G. Reynolds* were on his brief.

MR. JUSTICE BROWN, after making the above statement of the case, delivered the opinion of the court.

The only documentary evidence of title which appears in the record is the following translation of a grant purporting to have been signed by Damasio Salazar, described therein as a justice of the peace. In the original Spanish he is described as *Jues de pas* (paz) and subsequently as *" alcalde "* :

" Translation.

Seal fourth.              (Seal.)              One fourth real.
For the years eighteen hundred and forty and eighteen hundred and forty-one.

" In this second demarcation San Miguel de Bado, on the second day of the month of July of the present year eighteen hundred and forty-two, before me citizen Damasio Salazar, justice of the peace of said precinct, personally present appeared citizen Bentura Trujillo, citizen and resident of the first demarcation, soliciting the place and land commonly called the Ojito del Apache, to establish, in company with his children, a farm on which he believes he will have the means necessary for the support of a large family, and to give tithes (illegible) and the holy church their corresponding portions, and I, said alcalde finding the petition to be a just one and acting in conformity with the supreme decrees, have made him said donation in the name of God and the supreme Mexican nation, so that as a good compatriot he may make use of it, observing the requirements which our laws provide, under the condition and restrictions that if he does not provide a protection to prevent the damages which may result to him, he is under obligation to bear them, it being commons and pasture grounds of the inhabitants of this precinct; and the boundaries corresponding to said grant are on the north the mesa; on the south the old road to. Los Chupaines; on the east the Mesa de los Chupaines; and on the west the hills bordering on Cañoncito de la Lagunita; and in order that this foregoing instrument may have the force and validity by law required the aforesaid Trujillo requested me

to interpose my authority and judicial decree, and I, the said justice, declared that I would interpose, and did interpose, as far as I am authorized by law, those of my attendants signing with me with whom I act by appointment, for the notorious lack of a notary public, there being none of any kind in this department. In form of law, to all of which I certify.

DAMASIO SALAZAR.

Attending: RAFAL. ARAGON.

Attending: SALVADOR GONZALES.

"And it is given on this ante-stamped paper, there being none of the proper stamp.

SALAZAR."

1. The theory of the petitioner is that, some time prior to the date of this document, there was a grant by Governor Armijo to Venturo Trujillo, in accordance with his petition, and that the governor by his decree directed Salazar, the alcalde, to deliver to the petitioner juridical possession of the land; that said alcalde afterwards made return to the effect that he had done so, and that these documents were deposited in the archives of New Mexico, but were subsequently, and about the time of the occupation of the territory by the United States, lost and destroyed. In support of this theory he produced the deposition of Guadalupe Miranda, secretary of the Territory of New Mexico during the administration of Governor Armijo, taken November, 1873, to the effect that he was acquainted with Trujillo, and remembered that, about the year 1841 or 1842, he petitioned the governor for this grant of land; that the governor granted the petition, issued a decree to that effect, and directed the constitutional alcalde to place him in possession, "which said decree he signed as governor of the territory, and I signed the same along with him as secretary of said territory;" that the alcalde subsequently made return that he had placed the petitioner in possession, in obedience to the decree of the governor, and that these papers were duly deposited in the archives of New Mexico and remained under the charge of deponent as public records, he being at that time the legal custodian, and that

from this time Trujillo was considered and reputed as the lawful owner and possessor of the lands by the people in general, as well as by the territorial authorities.

Petitioner also produced the deposition of Rafael Aragon, taken about the same time, a man seventy-seven years of age and a laborer by occupation, who testified that the grant was made to Trujillo and his children in the year 1841 by the Alcalde Damasio Salazar; that witness was at the time the secretary of the alcalde, wrote the grant, and that the same was made under and by virtue of an order of the governor. In his own words he says: "The order referred to was a written one addressed to said Alcalde Salazar through Guadalupe Miranda, secretary of state of the government, and was of about this tenor, to wit: I am directed by his excellency the governor to say to you that upon the receipt hereof you will proceed to the place called the Ojito del Apache and will there place the petitioner, Ventura Trujillo, in possession of that land. Salazar was addressed in this communication as the alcalde of the second demarcation of San Miguel, and the communication was deposited among the archives of the alcalde's office. The directions of the order were carried out by the alcalde by placing Trujillo in possession of the land, and the alcalde then reported to Secretary Miranda that the governor's order had been duly executed. Salazar went upon the spot in company with Trujillo and placed the latter in possession by pointing out and designating to him the boundaries of the tract. Trujillo went upon the land to occupy it, I think, in July, 1842. He occupied the place four years, having built upon it a small house, constructed some small tanks, and planted some ground. He was succeeded on the place by Juan Lucero, he by Jesus Casados, and he by John L. Taylor, here present."

Francisco Trujillo also testified that his father, who was Ventura Trujillo, had brought a very rich woman from the Comanches, and after that, the Mexican government made this grant to his father, and that there was an order signed by the government (governor) with a man to go and deliver the land to his father. That he knows the order was signed by

Governor Armijo, and declared (directed) Damasio Salazar to go and deliver the land. That the land was delivered in the year 1842. That he was present when it was delivered by Salazar and Rafael Aragon, his secretary, and that a communication was signed stating that it had been delivered. He also states that he heard Salazar say, in respect to the order of the governor, that the order was to deliver the land to his father, and then he says that Damasio Salazar sent a communication to General Armijo, stating that the land had been delivered. That his father and Damasio Salazar both told him that it had been sent.

Upon the other hand, however, an inspection of the document signed by Salazar shows no reference whatever to a grant made by the governor or any order made by the governor directing him to put the grantee in juridical possession, although in making the grant he purports to be acting " in conformity with the supreme decrees," which means nothing more than he is acting in conformity with the laws of the land. The grant certifies that Trujillo personally appeared before him, solicited the land as a farm for the support of a large family, and that he, the alcalde, " finding the petition to be a just one, and acting in conformity with the supreme decrees, have made him said donation in the name of God and the supreme Mexican nation, so that as a good compatriot he may make good use of it," under certain conditions, and " in order that this foregoing instrument may have the force and validity by law required, the aforesaid Trujillo has requested me to interpose my authority and judicial decree, and I, the said justice, declared that I would interpose, and did interpose, as far as I am authorized by law."

Not only is there no reference to a decree of the governor, but it is doubtful whether the instrument was intended as an absolute grant of the land or anything more than a usufruct, as the donation is made " so that as a good compatriot he may make use of it," the land being declared to be " commons and pasture grounds of the inhabitants of this precinct."

Indeed, it is doubtful whether the reference in the petition to a grant of the governor was not an afterthought, inasmuch

as in a petition made by John L. Taylor (then claimant of his tract) to the surveyor general of New Mexico, about the year 1870, the following allegation is made as to the title: "Your petitioner would further state that said grant of land was duly made according to law and the usage and customs of the laws of New Mexico on the second day of July, eighteen hundred and forty-two (1842) by one Damasio Salazar, a justice of peace in the said county of San Miguel del Bado, to one J. C. Ventura Trujillo, a resident of said county of San Miguel del Bado." No reference was made in this petition to a grant by the governor. This petition having been rejected by the surveyor general, upon the ground that an alcalde had no power to make donation of vacant public lands, Taylor, in 1873, applied for a rehearing upon the ground of the newly discovered evidence of Miranda and Aragon to the effect that the governor had made such grant. The petition was again (December 19, 1872,) denied, "the matter being now before Congress."

It further appeared and was stipulated that a certain index made by Antonio B. Vigil, completed in the year 1851, and entitled "A general index of all documents of the Government of Spain and Mexico up to the year 1846," contained no mention of any grant of the Ojo del Apache tract.

Upon the whole, we think it extremely improbable that, if a grant had been made by the governor, no reference whatever should have been made to it by the alcalde, who, upon the theory of the petitioner, was acting merely as the right hand of the governor in putting Trujillo into possession. The document is not in the usual form of a return to an order of a governor to put a grantee into juridical possession of the land, of which the reports and records of this court show many examples, but of an attempt by an alcalde to make a grant himself upon the petition of an applicant. But if the governor had already made the grant why should the alcalde undertake to make one, or state the reasons why in his opinion it should be made?

He does not pretend to be acting pursuant to a decree of the governor, and makes no mention of a delivery of juridical

possession, by going upon the premises with the petitioner, pointing out the boundaries, plucking grass, or throwing stones, taking the grantee by the hand and leading him over the lands, or of any of the formalities which, under the Spanish and Mexican customs, were observed by the officer delivering possession. The document is such an one as the governor might have been expected to execute, but by no means such as to show that the alcalde intended to deliver juridical possession. In short, he assumed to do that which he had no right to do, and carefully omitted to do that for which he had complete legal authority.

When we consider what was required to be done under, the regulations for the colonization of the Territories of Mexico, made November 21, 1828, (Reynolds' Span. & Mex. Law, 141,) in pursuance of the act of the Mexican Congress of August 18, 1824, (Reynolds, 121,) and the practice of the officers in that connection, the failure to conform to the recognized methods of disposing of public lands becomes still more important. These regulations are stated in *United States* v. *Cambuston*, 20 How. 59, and *United States* v. *Bolton*, 23 How. 341, and required —

1. That the governor of the Territory should be empowered to grant vacant lands for the purposes of cultivation (Reg. No. 1, Reynolds, 141);

2. That a petition should be addressed to the governor, describing the applicant by name, country and profession, and, as distinctly as possible, the land requested (Reg. No. 2);

3. That the governor should proceed to obtain the necessary information with regard to the land and the petitioner, and whether there be any objection to making the grant (Reg. No. 3);

4. That, if the governor accede to the petition, he shall make a grant, describing the boundaries of the land, to serve as a title to the party interested, and refer it to a subordinate officer, such as an alcalde, to make delivery of juridical possession (Reg. No. 8, Hall's Mex. Law, sec. 511);

5. A return by such officer to the governor that he accompanied the petitioner to the lands and delivered possession to

him with the usual formalities observed for the investiture of title;

6. That these papers should be placed of record in the archives of the Territory, and that a copy, or *testimonio*, be delivered to the petitioner. Whether the grant of the governor required the approval of the Departmental Assembly, or Territorial Deputation, is not a question which arises in this case. Reg. 5, 6, 7, Hall's Mex. Law, sec. 580; *United States* v. *Reading*, 18 How. 1, 7; *Hornsby* v. *United States*, 10 Wall. 224; *United States* v. *Vigil*, 13 Wall. 449.

Not a single one of these formalities appears to have been observed, but we are left to infer from the testimony of two or three witnesses, who swore to their recollection of what took place thirty years before, that some of them were in fact observed. When we consider that this testimony is contradicted, or at least rendered exceedingly improbable by the only document which the petitioner is now able to produce, we must admit that oral testimony of this kind forms a very uncertain basis upon which to sustain a grant of lands. As we said with respect to a somewhat similar state of facts connected with an alleged grant of land in California, *Luco* v. *United States*, 23 How. 515, 543 : " It may be received as a general rule of decision, that no grant of land purporting to have issued from the late government of California should be received as genuine by the courts of the United States, unless it be found noted in the registers, or the expediente, or some part of it be found on file among the archives, where other and genuine grants of the same year are found; and that owing to the weakness of memory with regard to the dates of grants signed by them, the testimony of the late officers of that government cannot be received to supply or contradict the public records, or establish a title of which there is no trace to be found in the public archives." In the case of *Peralta* v. *United States*, 3 Wall. 434, it was said that written documentary evidence, no matter how formal and complete, or how well supported by the testimony of witnesses, if coming from private hands, is insufficient to establish a Mexican grant if there be nothing in the public records to

show that such evidence ever existed. But it was intimated that, if the claimant can show to the satisfaction of the court that the grant had been made in conformity to law and *recorded,* and that the record has been lost or destroyed, he will then be permitted to give secondary evidence of its contents. See also *Fuentes* v. *United States,* 22 How. 443; *United States* v. *Knight's Admrs.,* 1 Black, 227; *United States* v. *Vallejo,* 1 Black, 541.

In this case, however, the same uncertainty which exists with regard to a grant having been made by the governor, necessarily attends the fact as to whether it was ever recorded, and as no *testimonio* was ever delivered to the grantee, it must be held that the existence of the grant has not been proved.

That a justice of the peace, or an alcalde, had no power to make a grant of public lands is evident from the character of his office, which appears to have been analogous to that of an ordinary justice of the peace, (Decree of July 22, 1833, Reynolds, 170, 176,) and from the failure to find any evidence in the laws of Spain or Mexico that such power existed. Indeed, such want of power is admitted by the petitioner. See *Reynolds* v. *West,* 1 California, 322; *Crespin* v. *United States,* 168 U. S. 208, 213.

2. In further support of his petition, the depositions of several witnesses were introduced in evidence tending to show that the tract in question had been occupied by the original grantee and those claiming under him ever since the date of the alleged grant, and, indeed, for some years previous thereto. Upon the other hand, oral evidence was introduced by the Government to the effect that the land in question had never been occupied by the original grantee, but that he and his family lived at the time of his death, and for many years prior thereto, several miles distant from the land in question. While Trujillo had been upon the land in 1842, he made no improvements thereon, and after remaining a few days left the premises with the remark that the document, for which he paid three dollars to Salazar, was worth more than the whole grant; also that the property at that time, and for years subsequent to the possession by the Government of the

United States, had been used as common pasturing ground for the people of the vicinity, the alleged grantee or his representatives making no claim to be the owner thereof.

That it should be used for pasturage by the neighboring inhabitants is certainly consistent with the alleged grant, which describes the lands as "commons and pasture grounds of the inhabitants of this precinct," and there is nothing upon the face of the grant indicating that this right of pasturage was intended to be taken away. The grantee was apparently to be allowed to establish a farm there for the support of his family, but there is no intimation that he was to have the power to exclude the inhabitants from their customary use of such tract as commons and pasture grounds. Indeed, giving the fullest credence to his testimony, there is little or nothing to indicate that the possession of the grantee, under the alleged grant, was characterized by the notoriety, openness and exclusive character necessary to make out a title by adverse possession.

In addition to this, however, the possession did not begin until 1842, and at the date of the treaty of Guadalupe Hidalgo, in 1848, such possession had not lasted for more than six or seven years. In other words, the claim had not become "complete and perfect at the date of the treaty, nor one that claimant would have had a lawful right to make perfect had the territory not been acquired by the United States," within the meaning of the Court of Private Land Claims act. In *Crespin* v. *United States*, 168 U. S. 208, the plaintiffs claimed under a grant alleged to have been made in 1840, by a prefect, and also by adverse possession since that time. We held, however, that the language of the act creating the Court of Private Land Claims, above quoted, "would preclude the idea that possession since the date of the treaty, however exclusive and notorious, could be regarded as an element going to make up a perfect title. There was no evidence of more than six or eight years' possession prior to the date of the treaty, and this, under any construction of the Spanish or Mexican laws, would be insufficient to constitute a title against the sovereign." See also *Bergere* v. *United States*, 168 U. S. 66, 77; *Hayes* v.

*United States*, 170 U. S. 637, 649, 653. In this last case it is said : " As the ordinary prescription could not apply, and as the necessary time for the extraordinary prescription under the Spanish law had not run at the time of the acquisition of the territory by the United States, and as, clearly, whatever may have been the rule as to the operation of prescription against the Spanish or Mexican Governments, it did not run after the treaty against the United States, it follows that the claim of prescription is without foundation."

It would seem to follow from the general principle of law, so often asserted, that the statute of limitations does not run against the Government, that no length of possession since the treaty of 1848 would of itself give a valid title to land. How far the long-continued possession prior to the date of the treaty would be operative against the Spanish or Mexican Governments, is a question which does not arise in this case, where the possession did not exceed six years. See *Lindsey* v. *Miller*, 6 Pet. 666 ; *Gibson* v. *Chouteau*, 13 Wall. 92 ; *Weber* v. *Harbor Commissioners*, 18 Wall. 57, 70 ; *Sparks* v. *Pierce*, 115 U. S. 408 ; *Redfield* v. *Parks*, 132 U. S. 239.

In *United States* v. *De Haro*, 22 How. 293, there was a grant made in 1843 by Governor Alvarado of California, and, with a possession of sixteen years thereafter, was held to be sufficient presumption of a legal grant, but there was no requirement as above stated with regard to the Court of Private Land Claims act. In *United States* v. *Chaves*, 159 U. S. 452, there was evidence of an original grant in 1833 by the Government of New Mexico, although the original records had been lost. The grant was proved by secondary evidence, and a possession of sixty years thereunder, and it was held that a legal grant might be presumed upon proof of adverse possession for twenty years, the court observing: " Nothing, it is true, can be claimed by prescription which owes its origin to, and can only be had by, matter of record ; but lapse of time accompanied by acts done, or other circumstances, may warrant the jury in presuming a grant or title by record."

The doctrine at the foundation of that case is thus stated by Mr. Justice Story in *Ricard* v. *Williams*, 7 Wheat. 59,

109 : "A grant of land may as well be presumed as a grant of a fishery, or of common, or of a way. Presumptions of this nature are adopted from the general infirmity of human nature, the difficulty of preserving muniments of title, and the public policy of supporting long and uninterrupted possessions. They are founded upon the consideration that the facts are such as could not, according to the ordinary course of human affairs, occur, unless there was a transmutation of title to, or an admission of an existing adverse title in, the party in possession. They may, therefore, be encountered and rebutted by contrary presumptions; and can never fairly arise where all the circumstances are perfectly consistent with the non-existence of a grant; *a fortiori*, they cannot arise where the claim is of such a nature as is at variance with the supposition of a grant. In general, it is the policy of courts of law to limit the presumption of grants to periods analogous to those of the statute of limitations, in cases where the statute does not apply. But where the statute applies it constitutes, ordinarily, a sufficient title or defence, independently of any presumption of a grant, and therefore it is not generally resorted to. But if the circumstances of the case justify it, a presumption of a grant may as well be made in the one case as in the other; and where the other circumstances are very cogent and full, there is no absolute bar against the presumption of a grant, within a period short of the statute of limitations."

But this presumption is subject to the limitation that where title is claimed from a deed which is shown to be void, it will not be presumed that there was an independent grant, *Smith v. Higbee*, 12 Vermont, 113, or where surrounding circumstances are inconsistent with the theory of a grant. *Townsend v. Downer*, 32 Vermont, 183.

The substance of this doctrine is that lapse of time may be treated as helping out the presumption of a grant, but where a void grant is shown, it affords no presumption that another valid grant was made. Nor does such presumption arise if the surrounding circumstances are incompatible with the existence of a grant. In the case under consideration we

cannot find any evidence which justifies us in believing that a legal grant can have been made, and under those circumstances we cannot consider possession since the date of the treaty as dispensing with the requirement that the title, if not perfect at that time, was one which the claimant would have had a lawful right to make perfect, had the territory not been acquired by the United States.

In the view we have taken of this case, it becomes unnecessary to consider whether Governor Armijo had power or authority to make a grant of public lands without the assent of the territorial deputation or departmental assembly.

The judgment of the court below must therefore be

*Affirmed.*