<hr />

## STATE v. TAYLOR.

### Opinion delivered July 8, 1918.

1. EVIDENCE—TITLE—RECORDS IN OFFICE OF STATE LAND COMMISSIONER—EJECTMENT.—In an action in ejectment, an ancient record in the office of the State Land Commissioner, showing the disposition of certain sixteenth section lands, *held* admissible in evidence, the records being of ancient origin, with the appearance of being genuine, and appearing to have been made by some one connected with the State Land Office.

2. TITLE—GRANT OF LAND FROM THE STATE RECORDS IN STATE LAND OFFICE—PRESUMPTION.—In an action in ejectment brought by the State against defendants, who claimed title from the State to certain sixteenth section lands, the proof held sufficient to warrant a finding that the defendants held under a conveyance from the State, it appearing that the defendants and their grantors had been in possession of the lands many years, had paid taxes thereon continuously since 1858 and 1859, and that under the head of "Remarks" on the plat of said lands as it now appears of record in the State Land Office was the following: "This section was sold to P. and H. in 1859 (except lot 16), transferred to T. and A. (in the defendant's chain of title). They, T. and A., claim to have a deed to said land from the county court. * * *" These facts *held* sufficient to raise the presumption of an actual grant of the lands to the defendants from the proper State officers.

3. STATE—STATE LANDS—PURCHASE—DUTY TO MAKE DEED.—Where A. purchased lands from the State, and paid the consideration therefor, the State can not later object and seek to recover the lands on the ground that the deed to the purchaser was not executed by the proper officer.

Appeal from Craighead Circuit Court, Lake City District; *W. J. Driver*, Judge; affirmed.

*John D. Arbuckle,* Attorney General, *J. W. House,*
*Jr.,* and *Gordon Frierson,* for appellant.

1.   Congress by act June 23, 1836, vested the title to
the school lands in the State as trustee.   It is incumbent
therefore for appellees to deraign title from the State.
19 Ark. 308.

2.   Appellees do not claim to own the lands by virtue
of any patent issued by the State.   The notations and
excerpts from the register of school lands, sold and un-
sold, plats, etc., show, if anything, payment in Confed-
erate money bought at five cents on the dollar.   These
records serve no useful purpose and are irrelevant and
incompetent.

3.   The various acts of the Legislature as to six-
teenth section lands are unconstitutional and void.   Acts
1905, page 472; Acts 1911, page 5, etc.   They are an
effort to dispose of the lands without any consideration,
which it could not do.   Const., art. 14, § 2; 95 Ark. 65;
63 *Id.* 56; 106 Ind. 270; 6 N. E. 623.   The sheriff had no
power to sell and the purchaser acquired no title.   29
La. Ann. 77; 31 *Id.* 175; 40 Neb. 298; 58 N. W. 966; 42
N. Y. 404.   As to the unconstitutionality of the acts im-
pairing the school fund, see 5 Neb. 203; 64 N. J. Eq. 584;
22 N. E. 255; 51 Pac. 112; 72 Ky. (9 Bush), 259; 74 Ky.
(11 Bush), 74; 94 Ky. 177; 19 S. W. 405; 15 L. R. A. 825;
59 N. W. 907; 24 S. W. 272; 49 Mo. 236; 54 Ark. 468; 34
Pac. 274; 62 Fed. 417; 3 N. E. 165; 15 Mo. 412; 18 Col.
195; 29 La. Ann. 77; 40 Neb. 298; 56 Miss. 758; 13 Barb.
400; 73 Md. 521; 126 N. C. 689; 6 Ind. 83; 116 *Id.* 329; 16
Miss. 773; 31 La. 175; 73 Neb. 104, etc.

4.   The acts of the Legislature violate section 10,
art. 1, Const. U. S.; 19 Ark. 208; 4 Wall. 143-155; 2 Yer-
ger, 543; 1 Head (Tenn.), 172.

*Hawthorne & Hawthorne* and *Lamb & Frierson,* for
appellees.

1.   Review the legislation of Arkansas regarding
school lands.   The ancient records introduced were com-
petent and prove a sale by officers authorized to sell and
the act of 1911 is not a present grant but simply a cura-

tive act constitutional and valid.   Act 80 of 1875 is also
a curative act.   None of the cases cited by appellant con-
cern curative acts, and most of them are decided upon
provisions of State Constitutions differing from ours.
The history of legislation as to school lands is found in
act February 3, 1843; act January 1, 1861, p. 288; Acts
1875, No. 80; Manf. Dig., § § 1198, 1200, 6291, 6298, 6301;
act of 1853, "Revised Statutes of Arkansas," 994-8; chap.
145, p. 926, Digest of Statutes of Arkansas, p. 927;
Gantt's Digest, § 5570, etc.   The collector is authorized
to make deeds, etc.

2.   Grady's title is valid.   49 Ark. 172; act of 1869.
The collector was authorized to make the deed and the
land was paid for.   The sale was valid.   71 Ark. 484; 85
*Id*. 25; *Ib*. 372; 21 *Id*. 240.

3.   The notations under the head of "Remarks" of
the original plat book are ancient records and admissible
in evidence.   73 Ark. 27; 17 *Id*. 203, 218-19.   See also 27
Fed. 160; 1 Greenl. Ev. (16 ed.), 575-B; 33 Ga. 565; 2
Howard, 496; 27 So. 259; 11 Ala. 1028; 61 S. W. 695; 1C
R. C. L., p. 1097, § 299.

4.   Upon the subject of ancient records.   See 50 U.
S. (L. ed.), 125; 9 *Id*. 1137; 29 Atl. 376; 5 Tex. Civ. App.
650; 6 Vt. 170; 114 N. W. 133; 4 Watts & S. 378; 1 Dallas,
20; 28 Mich. 521; 26 Atl. 58; 57 Pa. St. 13; 32 Vt. 183; 12
Wheaton, 69; 3 Watts, 9; 10 Sar. & R. 383; 11 Eng. R. C.
349; 2 Metc. (Mass.), 83; 54 So. 415; 56 Fed. 483; 99 U.
S. 660; 25 U. S. (L. ed.), 306-7; 1 Greenl. Ev., § 483.

5.   The act of 1911 is valid and constitutional and
perfects the title of Taylor and Armstrong.   It is simply
a curative act.   3 Ark. 285; 25 *Id*. 101; 27 *Id*. 419; 48 *Id*.
307; 122 *Id*. 82; 100 *Id*. 175; 122 *Id*. 291; 86 *Id*. 231; *Ib*.
412; 71 So. 270; 73 S. W. 700; 47 Mo. 189; 15 Cal. 575;
16 *Id*. 221.   Adverse possession, paying taxes, etc., ap-
plies to school lands.   232 U. S. 168; 38 Ala. 600; 63 Ark.
56.   The statute runs against the State.   38 Ala. 600; 26
So. 245; 12 *Id*. 233; 57 Pac. 324; 24 So. 962; 56 Pac. 513.

The act is not unconstitutional.   18 How. 173; 232
U. S. 168.   It is simply a curative act.   71 So. 270; 57

*Id.* 967; 118 N. W. 415; 115 Pac. 687; 2 Col. 411; 15 Cal. 530; 16 *Id.* 220; 133 U. S. (33 L. E.), 631; 103 Ark. 446.

6.   Act No. 80, December 14, 1875, is a valid curative act, and confirms the title in Taylor and Armstrong. Cases *supra.*

7.   None of the cases cited by appellant are in point.

8.   The curative acts do not violate the United States Constitution.   19 Ark. 308, and cases cited *supra.*

Counsel for appellants, in reply.

1.   Spires' testimony is not material.   A sale for worthless bonds or scrip of no value is void.   64 N. J. Eq. 584.   If the memorandum is competent, appellees are bound by it and shows payment in worthless Confederate money.

2.   These ancient memoranda do not bind the State, and do not show valid payment or deeds made.   The State is not estopped.   93 Ark. 401.   The proof of these memoranda is not sufficient.   56 Fed. 483; 99 U. S. 660; 64 Ark. 100.

3.   The act 183, 1905, as amended by Act No. 10, Acts 1911, is not valid and constitutional even as a curative act.   43 Ark. 421.   It is beyond the power of the Legislature.   See 106 Ind. 207; 43 Ark. 156; 60 *Id.* 269; 43 *Id.* 420; 76 A. S. R. 322; 41 Md. 533; 80 N. W. 171; 50 Col. 388, etc.

STATEMENT OF FACTS.

On the 13th day of June, 1917, the State of Arkansas for the use of the common schools brought separate suits in ejectment in the circuit court against F. W. Taylor W. B. Armstrong, N. H. Grady and D. J. Darr to recover certain lands in Craighead County, Arkansas.   The lands in question were sixteenth section lands and were held by the parties under a claim of ownership by purchase from the State.

On motion and by consent of all parties the causes were consolidated and tried together before the court sitting as a jury.   After the commencement of the suit Darr sold his interest in the lands held by him to the defendant, Armstrong, and the cause of action as to Darr

was dismissed. The circuit court made a general finding of law and fact in favor of each of the defendants, Taylor, Armstrong and Grady.

From the judgment rendered the State has appealed. The facts necessary for a determination of the issues raised by the appeal are sufficiently stated in the opinion.

HART, J., (after stating the facts). The majority of the court is of the opinion that the question of whether or not the State has granted these lands to the defendants is a judicial one, dependent upon the facts, and that the finding of the circuit court in favor of the defendants can be sustained on the doctrine of presumptions of grants as announced in *Carter* v. *Goodson*, 114 Ark. 62. The principle upon which this doctrine rests arises from the general infirmity of human nature, the difficulty of preserving muniments of title, and the policy of supporting long and uninterrupted possession of lands. *Ricard* v. *Williams,* 7 Wheaton (U. S.), 59.

In *Beall* v. *Lynn,* 6 Harris & Johnson (Md.), 236, the court, in the discussion of this doctrine, said: "The grant of incorporeal hereditaments is often presumed from the undisturbed user thereof for a length of time. Grants from the Crown, in England, are presumed, from length of possession, and here even proprietary grants, under certain circumstances, are presumed. In general these presumptions are bottomed upon the existence of certain facts, which can leave but little doubt upon the mind of the truth of the fact which we are called upon to presume. They frequently, too, derive their force and efficacy from that vigilance with which the law guards ancient possessions, which, sooner than they should be disturbed, presumes that they had in contract a rightful commencement."

In that case it was held that a patent or grant for land in case of a peaceable and uninterrupted possession of upwards of sixty years, together with the payment of quit-rents or taxes, may be presumed to have been formerly issued, and it was also held that such presumption

was one of fact and not of law. See also *Mathews* v. *Burton,* 17 Grat. (Va.), 312.

In *State* v. *Wright,* 41 N. J. L. 478, it is said that the doctrine of presumption against the Crown, where the adverse claims could have had legal inception is recognized in many cases. This doctrine has been also recognized in cases in which the United States was a party. *United States* v. *Chaves,* 159 U. S. 452; *Hays v. United States,* 175 U. S. 248. In the latter case the court recognized that such presumptions are founded upon the consideration that the facts are such as could not, according to the ordinary course of human affairs, occur unless there was a transmutation of title to, or an admission of an existing adverse title in, the party in possession. Consequently the court held that such presumptions may be rebutted by contrary presumptions; and never fairly arise where all the circumstances are perfectly consistent with the nonexistence of a grant. The court also held that the presumption is subject to the limitation that where title is claimed from a deed which is shown to be void, it will not be presumed that there was an independent grant, or where surrounding circumstances are inconsistent with the theory of the grant. So in that case the court said there was no evidence to justify it in believing that a legal grant could ever have been made. In that case Hays produced oral testimony tending to show a grant of lands by the Governor of New Mexico and an order upon the alcalde to put him in possession; and also gave evidence tending to show that this document was afterwards lost. Hays also produced a grant by the alcalde in which no reference whatever was made to a prior grant by the government. The court held that the grant of the alcalde was inconsistent upon its face with the alleged grant by the Governor and held that no grant arose under the facts because of the inconsistency which was incompatible with the existence of a grant. In that case there could be no presumption of the grant from the alcalde because he had no power to make the grant and where a void grant is shown it affords no presumption

that another valid grant was made. Here the facts are essentially different. There is no evidence which is conclusively incompatible with the existence of a grant. Neither does the record conclusively show that if a grant was made that it was made by an officer who had no authority to execute it.

In this case it is urged that the possession of the various defendants is not of such a character that, taken in connection with the surrounding circumstances, a presumption could justifiably be founded upon it. Before considering the legal sufficiency of the evidence to support the finding of the circuit court, it may be well to consider an objection made to the introduction of evidence.

(1)   It is strongly insisted by counsel for the State that the notations under the head of remarks, hereinafter stated, on the books of the land office are not competent in this case. We do not agree with counsel in this contention. It is true that there is no showing when the notations were made, nor is there any statute providing that they shall be evidence in the course of the matters contained in them. If this were true, the record would be conclusive proof of what it contains. Although the record has no force as a record, still the entries are not wholly without probative force. Prior to the act of April 12, 1869, school lands were sold upon a petition of the inhabitants of the township to the common school commissioner of the county in which the land was situated. The commissioner made the sale and gave to the purchaser a certificate of purchase. The terms were on a credit of not less than one, nor more than five years. Upon payment of the money a patent was required to be made out by the Secretary of State from returns made to him by the common school commissioner. The patent was signed by the Governor and countersigned by the Secretary of State and contained a description of the land granted. The Secretary of State was required to keep a list of the sale and the date of each patent. Sections 49-56 of chapter 154, Gould's Digest of the Arkansas statutes. Under

the act of April 12, 1869, the collector was substituted for
the common school commissioner in making the sale. Acts
of 1869, page 190. The office of Commissioner of Immi-
gration and State Lands was created by the act of July
15, 1868. Acts of 1868, page 61. There is now in the
office of the State Land Commissioner a register of the
school lands. This record shows the names of the pur-
chasers of the lands and the dates when the patents were
issued to them. There is nothing to show when these
records came into the possession of the State Land Com-
missioner. The earlier records show entries prior to the
date of the creation of the office of State Land Commis-
sioner. One of these records has posted on its front page
a printed opinion from the Attorney General to the Sec-
retary of State in regard to certain school lands. This
opinion bears the date of August 15, 1853. The records
contain notations of the sale of school land for several
years prior to this date and up until several years later
than 1860. As we have already seen, it was the duty of
the Secretary of State during these years to keep a reg-
istry of the sales of the school lands together with the
date of the issuance of the patents to the purchaser. This
tends to show that these records were turned over to the
Land Commissioner by the Secretary of State. Other
records found in the State Land Office relating to the
disposition of the school lands during the same period
of years are called the plat books. These books contain
a plat of the sixteenth section lands together with a de-
scription of them according to the United States sur-
veys. The notations hereinafter referred to are recorded
on these plats. The lands in controversy are shown on
page 71 of one of the plat records. Numerous other
pages of the record contain notations in the same ink and
in the same handwriting in regard to the sale of the
school lands. In many instances reference is made to the
record of the register of school lands for information
as to the date of the issuance of the patents. Ob-
servation of the entries on this record show it to be
an ancient one free from suspicion, and made at a

time when the officer had information before him with reference to which the notations were made. It appears from the testimony that these records are constantly used and acted upon by the State Land Commissioner and those seeking information in regard to these lands. It will be observed that the lands were placed upon the tax books and assessed for taxation at once. The record shows that the defendants and their predecessors in title have paid taxes on them since the date of purchase shown by the entries on the plat books of the State Land Commissioner. We think the entries on this record may be given in evidence because they are of ancient origin, appear to be genuine, and to have been made by some one connected with the State Land Office. They may be considered in connection with the other facts and circumstances proved. Such entries or notations are admissible upon the ground that they appear to be acts having a necessary or natural connection with other official acts, all pointing to the execution of deeds to the purchasers of the school lands. See *Townsend* v. *The Estate of Downer,* **32 Vt. 183.**

In *Carter* v. *Tinicum Fishing Company,* 77 Penn. 310, the court, speaking through Chief Justice Agnew, said: "Presumptions arising from great lapse of time and nonclaim are admitted sources of evidence, which a court is bound to submit to a jury as the foundation of title by conveyances long since lost or destroyed." The learned Chief Justice also quoted from the opinion of Justice Sergeant in *Foulk* v. *Brown,* 2 Watts (Pa.), 209, as follows: "The rule of presumption, when traced to its foundation, is a rule of convenience and policy, the result of a necessary regard to the peace and security of society. No person ought to be permitted to lie by whilst transactions can be fairly investigated and justly determined, until time has involved them in uncertainty and obscurity, and then ask for an inquiry. Justice can not be satisfactorily done when parties and witnesses are dead, vouchers lost or thrown away; and a new generation has appeared on the stage of life, unacquainted with

affairs of a past age, and often regardless of them. Papers which our predecessors have carefully preserved. are often thrown aside, or scattered as useless by their successors. It has been truly said that if families were compelled to preserve them, they would accumulate to a burthensome extent.''

In discussing presumptive evidence, Professor Greenleaf said: ''Thus, also, though lapse of time does not of itself, furnish a conclusive legal bar to the title of the sovereign, agreeably to the maxim, *''nullum tempus occurrit regi,''* yet, if the adverse claim could have had a legal commencement, juries are instructed or advised to presume such commencement, after many years of uninterrupted adverse possession or enjoyment. Accordingly, royal grants have been thus found by the jury, after an indefinitely long continued peaceable enjoyment, accompanied by the usual acts of ownership.'' Greenleaf on Evidence (16 ed.), vol. 1, par. 45.

(2) In regard to the Taylor land there is a stipulation that the defendant and his predecessors in title have paid the taxes on said land continuously from the year 1859, to and for the year 1916, inclusive, and that such taxes amounted to the sum of $937.42; that prior to the year 1911 said lands were wild and unimproved, that the owner began to clear and put the land into cultivation in the year 1911, and that about 135 acres are now cleared and in cultivation; that the rental value amounts in the aggregate to $1,200 per annum. Under the head of remarks on the plat of said lands as now appears of record in the State Land Office is the following: ''This section was sold to Pollard & Hillis in 1859 (except lot 16); transferred to Taylor & Armstrong. They, Taylor and Armstrong, claim to have a deed to said land from the county court of Craighead County. Payment made in Confederate money, bought for the purpose of making the payment at five cents on the dollar.''

It is, also, shown that the improvements made on said lands by the defendant and those under whom he claims title amount to $5,446 and that they consist of

clearing the land for cultivation, fencing the same and erecting a dwelling house and other buildings thereon.

In the Armstrong case the defendant and those under whom he claims title have paid the taxes continuously upon part of said land from the year 1860 to and including the year 1916, and upon a part of it from the year 1858 to and for the year 1916, and that said taxes amount to $561.72. The notations in the land office in regard to this land are also as follows: "This section was sold to Pollard & Hillis in 1859 (except lot 16); transferred to Taylor & Armstrong. They, Taylor and Armstrong, claim to have a deed to said land from the county court of Craighead County. Payment made in Confederate money, bought for the purpose of making the payment at five cents on the dollar."

The value of the improvements on this land consisting of clearing the land and fencing the same and buildings erected amounted to $3,800. In testing the legal sufficiency of the evidence to support the finding of the court, it must be considered in the light most favorable to the defendant, and when so considered it is substantially as stated above. The cases were consolidated and tried before the court sitting as a jury. When all the facts and circumstances just recited are considered together, it was sufficient to raise the presumption of an actual grant of the land from the proper State officers to the defendants.

As stated in *Townsend* v. *The Estate of Downer, supra*: "It is the characteristic of circumstantial evidence that while the circumstances taken singly and separately, prove little or nothing, all of them together harmonize and point to a result which the mind must adopt as necessarily following the coincidence of all the facts, all so coinciding that they can not reasonably be accounted for without the result."

(4) With reference to the Grady land, but little need be said. The sale of this land was made on February 12, 1881, by the sheriff and collector of the county. At that time the sheriff was the proper officer to make

the sale and the land could be sold on deferred payments. Under the law as it then existed, it was the duty of the Secretary of State to make out the patent which was to be signed by the Governor and countersigned by the Secretary of State. Gantt's Digest (1874) Statutes of Arkansas, sections 5560-5571. By the Act of March 22, 1881, it was made the duty of the county collector to execute the deed. Acts of 1881, p. 154.

The deed in the present case was made by the sheriff and collector on December 31, 1885. Grady and his predecessor in title have paid all the taxes from 1881 to 1916, inclusive, amounting to $603.14. Grady and his grantor have cleared and put into cultivation thirty-eight acres of said land and the improvements put on the land by them are of the value of $1,520.

It is the contention of the State that the deed should not have been made by the collector but should have been made by the officers whose duty it was to make the deeds under the law as it existed on the date of the sale. We need not decide that question. The record shows that the person from whom Grady purchased the lands bought from the purchaser at the sale, and a preponderance of the evidence shows that the purchase money has been paid. Therefore, it was the duty of the State, through its proper officers, to make the purchaser a deed to the land, and it could not take advantage of its default in this respect to recover the lands.

It follows from the views expressed by a majority of the court that the decree in all three of the cases will be affirmed.

McCULLOCH, C. J., and SMITH, J., concur in the judgment.