MILLER v. KANSAS CITY SOUTHERN RAILWAY CO.

4-8950                                    225 S. W. 2d 18

Opinion delivered December 13, 1949.

*J. F. Quillin,* for appellant.

*Hardin, Barton & Shaw,* for appellee.

GRIFFIN SMITH, Chief Justice. A spur track in the Town of Potter now operated by Kansas City Southern was laid before 1907, and within limitations has been continuously used as intermittent necessity required. It traverses property purchased in 1936 by Mrs. Lora Miller, described by metes and bounds. Marcus L. Miller is Lora's husband and maintains a mercantile business in a building on his wife's property. An extension, spoken of as a front porch, is so near the railroad spur that joint use of the area between store and track causes conflict. This resulted in a suit by the Railway Company to acquire by condemnation "some additional lands". Apprehending that enlarged use responsive to the Railroad's complaint would extend onto the store porch, Mrs. Miller's answer and cross-complaint alleged damages of $25,000. She also claimed that trackage use of 120 feet of her land should be compensated at $150 per year, or $1,800 for the time she had been the owner. Marcus Miller intervened. Practical use of the store, he said, would be lost if land in front of it should be taken as proposed. Resulting damage would be $10,000. A final plea was that value of the Miller residence back of and virtually adjoining the store would be impaired.

By amendment of January 20, 1948, the plaintiff asserted its ownership of property described as a "team track", with eight and a half feet on either side, meas-

ured from track center. Nine months later a second amendment was filed, in which the Company abandoned its allegation that Mrs. Miller owned the land. As cross-defendant it claimed title to the so-called team track, "and to the ground used in and on account of same". There was, in addition, a plea of adverse possession under the seven-year statute. On issues thus joined the jury's verdict was that "title is in Kansas City Southern".

*Lost Title—Presumption of Grant.*—Although appellee's argument for affirmance rests primarily upon adverse possession, there is insistence that the nature of its occupancy, the obvious purpose prompting construction of the spur, apparent acquiescence in unrestricted use for more than forty years, and knowledge by Mrs. Miller that the track was in place when she bought the land—each element constituted notice to her that the Company claimed by purchase or prior condemnation.

We are not convinced that the Company has brought itself within the rule of presumptive evidence discussed in the citation from Greenleaf, 16th Ed., vol. 1, par. 45. The author's conclusion was that while mere lapse of time does not raise a conclusive legal bar to title where the sovereign's rights are involved, yet, if the adverse claim could have had a legal beginning, "juries are advised to presume such commencement, after many years of uninterrupted adverse possession or enjoyment". See *State* v. *Taylor,* and the cases there discussed by Mr. Justice HART, 135 Ark. 232, 205 S. W. 104. But, where the State is concerned, or where the sovereign undertakes to profit because of the negative nature of the records, there is another rule. It is that after payment of taxes in good faith for not less than fifteen years the presumption of a grant may be one of law, as distinguished from one of fact. *Deniston* v. *Langsford,* 211 Ark. 780, 202 S. W. 2d 760.

Facts relating to occupancy are ordinarily for a jury's consideration in determining probabilities, for "No person ought to be permitted to lie by whilst transactions can be fairly investigated and justly determined,

until time has involved them in uncertainty and obscurity, and then ask for an inquiry".

If Kansas City Southern had shown a custom of recording and keeping its deeds, or of preserving records of condemnation, its plea of presumptive grant would have been more tenable under a showing that such documents had been lost without its fault, as, for instance, that a courthouse vault had burned, or that its own files had suffered. But according to original pleadings the Company did not believe that it had bought or condemned the right-of-way; nor did the evidence it introduced go to the essential consideration that time had militated against such proof. Considering all of the circumstances here, a grant could not be presumed.

*Adverse Possession — Seven-Year Statute.* — Evidence was sufficient to go to the jury on this issue. Mrs. Miller's tax receipts for twelve years, showing payment on land across which the road ran, were offset by appellee's proof of assessments embracing the trackage. Appellants argue that because assessments by the Arkansas Public Service Commission [1] were on a mileage basis, nothing essential to right-of-ways was included, and trackage alone was evaluated. For this reason, they say, land beyond crosstie ends was not assessed. This contention, standing alone, would have to be rejected. We think, however, that the Company's own witnesses bind it to the narrower limits.

Potter, it must be remembered, is a small community. It lies six miles south of Mena, and the Railroad Company's activities there, respecting use of incidental facilities, have not been pretentious. The spur runs through lands beyond Mrs. Miller's. Three lines are shown on the plat: "Main Line, Passing Track, and Team Track". M. A. Eddy, Company trainmaster, was asked about the team track right-of-way. The question was, "We are talking about that little track: the one that comes off of the passing track and goes out some two hundred feet—how much right-of-way [goes with] that

[1] Now Arkansas Tax Commission. See Act 191, approved Feb. 28, 1949, p. 592.

track, [or] what clearance would be required on the team track?'' Answer, ''It would take six feet from the center of the track.[2]

In testifying to objections by Miller to use of the area between store and track, Eddy said that he received a letter, perhaps in April, 1946. Pursuant to it the Company gave instructions that the activities be discontinued. Eddy thought it had ''always been understood'' that the Railroad Company was permissively using the land, ''and we are using the land now like we have always used it''. On redirect examination one of appellee's attorneys asked Eddy if it were contemplated that ''this loading proposition'' should be placed farther down—perhaps on the Allen or Keener property—and he said that was his understanding, and it ''was the purpose of this suit''.

Eldon D. Pence, the Company's general agent, mentioned plans for extending the team track through to a connection with the passing track, or the main track. Standard ''public clearance for cars'', according to Pence, calls for eight feet from track center.

*Sufficiency of the Evidence.*—When the Railroad Company sought to condemn in 1947, substance of its complaint was a denial of what it later claimed. It is fairly inferable that if the Millers had not advanced extravant damage claims, suit would have proceeded as it began. There can be no doubt that the Company had for more than forty years claimed a right to use the trackway as such, and the question is, What bordering land went with it, if any? Was it the actual space that track-on-ties occupied? or was there, in addition, hostile notice that Company necessities incident to land actually used extended to adjacent footage sufficient to meet reasonable needs auxiliary to loading and unloading

---

[2] Eddy was asked what use was contemplated through enlarged facilities, and he replied: ''We want to use it for team track purposes and for the convenience of our patrons in disposing of bad order cars, or for storing outfits in case that we would have construction work to do along the line of some kind, it is necessary we have a track to place outfits away from the team track patrons''. [The term ''team track'' was defined as ''Where we 'spot' any commodities that might be—that *will* be—unloaded by trucks or teams''].

wherever cars should be spotted? Was the former course of conduct, when tested by the Company's current purpose to use an undetermined area as necessity suggested, consistent with what it now proposes, and was that conduct sufficiently adverse, hostile, and of general knowledge?

The Company is saying, in effect, that it *may* engage in construction work elsewhere on its lines; that something now contemplated as a probability, but not required for more than a quarter of a century, might necessitate additional space, and that "outfits" should have places "away from track team patrons".

The jury found that title to all of the disputed land was "in" Kansas City Southern, and the Company was entitled to possession. If the purpose was to predicate the verdict upon a lost grant, or to title in fee, it is not factually supported; if upon adverse possession, then the use-right for railroad purpose, with reversion to the fee owner should the easement be abandoned, is the usual rule.

With facts varying somewhat from Miller's problem here, Mr. Justice Wood's opinion in *St. Louis S. W. Railway Company* v. *Davis*, 75 Ark. 283, 87 S. W. 445, is of assistance in ascertaining extent of appellee's rights. Davis had built a sawmill near the railroad, stacked lumber on part of the claimed easement, and then fenced the property so invaded. Held, that in the absence of a grant, . . . or donation, and without appropriation under charter powers, a railroad company will not acquire title by prescription or adverse possession to more land than it takes and holds by actual occupancy. There, as here, it was not shown that when entry was made permission given by the proprietor "extended to any portion of the land other than that covered by the track".

In *Little Rock & Fort Smith Railway Company* v. *Greer*, 77 Ark. 387, 96 S. W. 129, the appellant claimed a 99-ft. right-of-way, extending 49½ feet from track center. It was held that Greer had a cause of action for special damage occasioned by the railroad company's act in building an embankment. Oscar L. Miles, one of

the South's ablest attorneys, contended on behalf of the railroad that the holding was in conflict with *Hot Springs Railroad Company* v. *Williams*, 45 Ark. 429. The opinion was written by Mr. Justice WOOD, but on rehearing Judge McCULLOCH said, in speaking for the entire Court: "Where a railroad corporation lawfully acquires a right-of-way over any land, either by grant, prescription, or condemnation, such acquisition covers all damages, present and prospective, resulting to the owner whose land is invaded, this upon the theory that full compensation is allowed at the time, and can be recovered only once. This principle applies, however, only to one whose land has been invaded, and to the extent only of such invasion. One whose land has not been previously taken under voluntary grant, prescription, or condemnation, may recover compensation for damage whenever the same accrues; and where there is a new or additional taking, damages therefor may be recovered. According to the agreed statement of facts in the case, the railroad company never acquired a right-of-way by grant or condemnation. *Its acquisition by prescription was, therefore, only to the extent of the actual taking, which was the land covered by the roadbed, and no more*".

Uncertainty regarding the amount of land intended to be held, whether adversely or under an assumed grant, is reflected here by railroad company witnesses. Trainmaster Eddy thought six feet each way from track center had been taken, not eight and a half feet as appellee contends. General Agent Pence thought of sixteen feet—eight each way. No witness testified that for a period of seven years or more the use of any area beyond that occupied by the track and ties had been of a kind to put adjacent proprietors on notice that something more was being claimed than use of the track as a means for moving cars from point to point. It follows that under the Davis decision, supported by the Greer case and others of like import, possession in the controversy here ceased at tie's end on each side of the track.

Since all issues appear to have been fully developed, that part of the judgment denying recovery on the in-

tervention and cross-complaint will be affirmed, but we reverse so much of the judgment as quiets title in the railroad to property beyond actual trackage, as heretofore defined. Because title to real property is involved, the cause is remanded with directions that the judgment be modified to the extent indicated. It is so ordered.

Mr. Justice HOLT dissents in part.

HOLT, J. I respectfully dissent. In the majority opinion appears this language: "No witness testified that for a period of seven years or more, the use of any area beyond that occupied by the track and ties had been of a kind to put adjacent proprietors on notice that something more was being claimed than use of the track as a means for moving cars from point to point. * * * It follows that possession in the controversy ceased at ties end on each side of the track."

There appears to be no proof in the record as to the length of the crossties, the distance between the rails, or the width of boxcars. Therefore, as I construe the law, we may take judicial notice, since we are dealing here with the operations of a standard gauge American railroad, that such ties are 8 feet long, the rails 4 feet 8½ inches apart, and the maximum width of boxcars used is 10 feet 8 inches. Such cars obviously must extend out beyond the rails and ends of the ties on either side for a considerable distance.

The text writer in *23 C. J.*, page 67 (§ 1824) bb, has this to say on the question of judicial notice: "Courts take judicial cognizance of matters of general knowledge relating to the grade and gauge of railroads, the necessity of repairs and replacements, the duties of section men, and that the ties of a railroad track usually project, slightly, in some instances, and more in others, above the surface of the track. * * * Judicial notice is taken of the construction of railway carriages, and of conspicuous features of railroad rolling stock such as the extension or projection of engines and cars beyond, and outside of, the rails on which they run."

The jury found, on proper instructions, that appellee had used, and claimed adversely, a right-of-way 8½ feet from the center of the track on each side, or 17 feet in width, in its operation. Appellee had used and maintained this 17 ft. space since 1907, or for more than 40 years, and no one had ever questioned its title. Although appellee appears to have no record title, or deed, in the circumstances, I think a presumptive grant was clearly established.

"Generally a grant will be presumed on proof of an adverse, exclusive and uninterrupted possession for 20 years and such rule will be applied as a *presumptio juris et de jure,* whether by possibility a right may be acquired in any manner known to law." *45 Fed. Supp.* 681.

We never reverse when there is substantial evidence to support the jury's verdict, as here.

The land described in appellee's complaint was 17 feet wide as measured 8½ feet from the center of appellee's railway track to each side, and the trial court instructed the jury that if it should find that the railway company took possession of the land described in its complaint and "has for a greater period than seven years openly, continuously, adversely and exclusively had the possession of said property" then as a matter of law, the property now belongs to appellee.

There was substantial evidence that 17 feet of land was used by the railroad "for clearance" and in its operations. Obviously, brakemen and employees must have some space beyond the ends of the ties to perform such duties as mounting cars, alighting therefrom and making couplings.

M. A. Eddy testified that 17 to 17½ feet was necessary, and so used, and the jury, by its verdict, has so found.

We, therefore, are not called upon to guess as to the width of the property actually claimed and used by the railroad.

From a practical standpoint, how could appellee operate, or clear its freight cars, on this track on a space

measured by the length of a crosstie of the standard length of 8 feet?

The jury, by its verdict, presumably composed of practical men, evidently thought that it could not be done.

Each case must be governed by its own facts and I think that there was substantial evidence here to warrant the jury's finding that the railroad was entitled to the 17 feet which it had actually claimed and used in its operations adversely for more than 40 years.

This court said in *Memphis & Little Rock Railroad Company* v. *Organ,* 67 Ark. 84, 55 S. W. 952: "The possession of the railroad company, although wrong in the beginning, may ripen into a right by virtue of the continuance of the wrong for the requisite statutory period. As seven years' adverse possession, under the statutes of this state, will bar an action to recover lands, it will be sufficient to bar the action to enforce the claim of the owner against the land or to enjoin the railroad company from using it until just compensation is made, as in that time the right necessary to support the action will be divested, and there will be no basis upon which it can be maintained.' 51 Ark. 271; citing: *Howard* v. *State,* 47 Ark. 431, 2 S. W. 331; *Patton* v. *State,* 50 Ark. 53, 6 S. W. 227, where it was held by this court that 'a road becomes established as a public highway, by prescription, when the public, with the knowledge of the owner of the soil, has claimed and continuously exercised the right of using it for a public highway for the period of seven years, unless it was so used by leave, favor or mistake.' In the Patton case it was said, 'the right to a public highway acquired in this manner is based upon adverse possession for the full statutory period of limitation.' The same doctrine applies with equal force to railroads. In both cases the land is taken and appropriated and used as a highway for the public benefit. We know of no reason why the same limitation should not prevail in both cases."

The judgment should be affirmed.