193 So.2d 587 (1967)
In re ESTATE of Mary Bailey HALL, Deceased.
Blanche S. HENDERSON et al., William J. Veazey et al.
v.
W.W. LATHAM, Jr., Administrator.
No. 44169.
Supreme Court of Mississippi.
January 3, 1967.
Opinion Clarified February 6, 1967.
*588 Alexander, Feduccia & Alexander, Cleveland, Troutt & Moore, Senatobia, Robert G. Johnston, Cleveland, for appellants.
John White Valentine, Cleveland, for appellee.
Opinion Clarified February 6, 1967. See 195 So.2d 94.
ROBERTSON, Justice:
This is an appeal from the judgment of the Chancery Court of the Second Judicial District of Bolivar County, Mississippi, holding that two long letters of the decedent, Mrs. Mary Bailey Hall, were testamentary in character and should be admitted to probate as the Last Will and Testament of decedent. The Chancery Court further held that under the provisions of these two letter-wills, Mrs. Blanche S. Henderson, a half-sister, and Mrs. Katherine Henderson Waldrop, a half-niece, were entitled to receive the income from the 80 acres of farm land and the home at Merigold, Mississippi, during their natural life, and that upon their death, these two properties would go into a charitable trust with the income therefrom being used to educate poor boys and girls of Bolivar County, Mississippi, in a Christian college. The Court also found that the evidence was insufficient to establish a trust, constructive or otherwise, on the Harrison County land and that it descended to the heirs at law in these proportions: 50% to Mrs. Blanche S. Henderson, 12 1/2% to William J. Veazey, 12 1/2% to Lamar M. Veazey, 12 1/2% to Morgan Veazey, and 12 1/2% to Bettye Jean Mangialardi.
*589 The principal appellants are Mrs. Blanche S. Henderson and her daughter, Katherine Henderson Waldrop, who assign as error: the failure of the chancery court to decree that the full fee simple title to the 80 acres of farm land and the home site in Merigold, Mississippi, is in them, and the failure of the court to establish a constructive or resulting trust on the Harrison County land in their favor.
After a thorough search and inquiry, no last will and testament of the decedent was ever found. These two long rambling letters, 25 legal-cap pages entirely in the handwriting of the decedent, the first letter dated July 15, 1946, and the second dated October 30, 1951 (or 1957), demonstrate to this Court that the decedent did not intend to die intestate and these letters, while in some respects vague, indefinite, and confusing, do express her intentions as to what she wants done with her property after her death. We think that the Chancellor was correct in finding them testamentary in character and we affirm his judgment in allowing these two letters to be probated as the last will and testament of the decedent.
After carefully considering the two letter-wills as a whole and from their four corners, it is clear to us that the primary, dominant and overriding purpose and intent of the decedent was to provide out of her estate not only the necessities of life, but the comforts also, for Mrs. Henderson and Mrs. Waldrop, the half-sister and half-niece with whom she had spent a goodly portion of her life.
The letter-will of July 15, 1946, addressed to Mrs. Blanche S. Henderson, contains much language clearly demonstrating this primary and overriding purpose. In speaking of Katherine Henderson Waldrop, who had been in and out of the Mississippi State Hospital, the decedent had this to say:
"I shall deny my self of all possible and as long as I can raise what necessary to give her privacy and all comfort possible  she shall suffer nothing and want for nothing in my power to give and you can let your mind be entirely at ease  you can know as long as I live all I can raise will go for Ks care and when I die my home and all in it is hers and yours  you can sell and buy one else where, but proceeds has to go in home cant be spent  this to insure a home as long as you both live  the rents from my two places has yearly payments, if I have not paid off debt before I die, taxes and up keep is yours & Ks as long as both live, either survivor gets all, as long as live."
"* * *"

"Home or rent from home or the home you buy should you & K. want to sell and buy elsewhere yours and K's or survivor as long as live, then unless home well paying property, better paying than some farm land would be, is to be sold and farm land bought and if you and K. preferred selling home and having rents from farm land you can sell home and buy land to rent." (Emphasis added.)
It is very apparent from the above language of the letter-will that the decedent was very much concerned with providing a home for her half-sister, Mrs. Henderson, and her half-niece, Mrs. Waldrop, a roof over their heads and a shelter from the storm, as it were. Other language of the letter-will of July 15, 1946, that sheds light on this overriding purpose is:
"I am going to have will re written to provide in case of your death before K. (I know as long as you live you will look after K's part) for K's income to be given to her monthly instead of all in lump sum when rents are collected or if in institution used for her comfort & care all to be paid to you as long as you live with you giving K. her share as needed, but when you die rents go in trust fund or under care of a Trust Bank to pay to her (K) if, as I hope, out of *590 an institution, if in, see to being used for her comfort & care and if more than needed for her let rest go to Jack's children "
"* * *"

"You see as long as I live I will do all possible for K. and after I die I will continue to provide for her as long as she lives so only my losing all I have will prevent her from always being cared for and I do not believe God will let me lose all and if I do it will be lost because I was trying to make more to have for her." (Emphasis added.)
In the letter-will of October 30, 1951 (1957), the decedent had this to say about the matter that was on her mind all the time:

"The rent from all land I am able to leave is to go to you & K. for your life and after you two have died the rents will go, part to churches rest used for Christian (church school  any denomination but prefer a Methodist College) education of poor boys and girls as long as world stands.
"I hope to live to be free of debt and have more land so rents may be not less than $5,000.00 per year &c &c
"If I am able to have enough so that the rents would be more than necessary for comfortable living for you & K. or the survivor all above what would be necessary for comfortable living of you two will be applied on educational fund. * * *" (Emphasis added.)
Mrs. Hall, the decedent, was always the eternal optimist. There was no doubt in her mind that she was a good business woman, that she would expand her farming operations from year to year, and make a pile of money.
Then during her life time she would provide the necessities and comforts of life for the only family she ever really knew, the family that she had lived with from 1914 through 1923. She was especially anxious to do everything she possibly could for the daughter of the family, Mrs. Waldrop, the decedent always considering her as the daughter she never had. After her death, the decedent intended for this daughter, Mrs. Waldrop, and decedent's half-sister, Mrs. Henderson, to lack for nothing because she, the decedent, was going to provide by her will for their every need and want. This is what she thought she had done in her two letter-wills.
The truth of the matter is that her holdings steadily dwindled during the period between the making of her letter-wills and her death. Her valuable farm lands went down from 280 acres to 80 acres. As she got older she was not able to rent other lands and to farm her own land as intensively as in the past. This did not seem to bother her particularly because she thought that she had adequately provided for her loved ones in a flexible will in which she had expressed her intent and purpose over and over again, that intent and purpose being to provide first and foremost a home and then the comforts and necessities of life for her beloved half-niece and half-sister.
After Mrs. Henderson and Mrs. Waldrop had passed from this earthly scene the decedent wanted to help with the education of Jack Henderson's children. The specific provision of the letter-will of July 15, 1946, which treats of this, says:
"Then if Joyce & Johnnie not educated or any future children of Jacks goes for education of them  then after that  after you and K have passed on, then to Jack's children until educated and able to make their own, or should he have any afflicted child and need (Jack not able to provide) used for him or her as long as lives."
Jack Henderson is the brother of Mrs. Waldrop, and, therefore, a half-nephew of the decedent. Jack had two living adult *591 children, neither of whom is afflicted. Each has renounced in writing any claim against the estate of decedent for any purpose. Jack Henderson is now 53 years of age and more than 7 years ago had a surgical operation which rendered him sterile. Medical testimony in the record indicated that the birth of a child after such an operation would be "rather rare and almost a miracle".
We agree with the Chancellor that all of the contingencies upon which any devise or bequest to Jack's children hinged have been effectively negatived, and that Jack's children take nothing under the provisions of the two letter-wills.
The decedent then provided for the establishment of a charitable trust in the letter-will of July 15, 1946:

"Then proceeds go, as loan, to educate poor boys & girls as long as world stands  a Julia Weissinger Bailey Memorial fund  which in course of time will be big enough to keep a number in College yearly "
The letter-will of October 30, 1951 (1957) has more to say on this point:
"The rent from all land I am able to leave is to go to you & K. for your life and after you two have died the rents will go, part to churches rest used for Christian (church school  any denomination but prefer a Methodist College) education of poor boys and girls as long as world stands.

"I hope to live to be free of debt and have more land so rents may be not less than $5000.00 per year &c &c
"If I am able to have enough so that the rents would be more than necessary for comfortable living for you & K. or the survivor all above what would be necessary for comfortable living of you two will be applied on educational fund." (Emphasis added).
The Chancellor found that the phrase "part to churches" is too vague and indefinite and being incapable of ascertainment, is null, void and of no effect. We affirm this finding of the Chancellor.
The Court was correct in holding that a charitable trust was created by the language of the letter-wills for the education of poor boys and girls in a Christian college (preferably a Methodist college).
15 Am.Jur.2d, Charities, section 11 (1964), has this to say on charitable trusts:

"It is the fixed policy of the law to uphold charitable gifts and trusts whenever possible, and this is a fundamental principle in the construction of charitable trusts. Of course, a true `charitable' nature of a gift must first appear before the courts will extend themselves in its support. Some measure of public benefit must appear or be in prospect from sustaining the gift, and it must appear to be capable of administration and control by the court, * * *." (Emphasis added.)
The advancement of education and the relief of poverty are two of the favorite subjects of charitable trusts. Both causes have been held many times to be truly charitable in nature and of great benefit to the public. Both are present in the charitable trust set up by the decedent in the instant case when she provides for the establishment of a trust fund for the education of poor boys and girls in a Christian college.
The most important distinction between a private trust and a charitable trust is with reference to the beneficiaries. A private trust is not valid unless there is a beneficiary who is definitely ascertained at the time of the creation of the trust or definitely ascertainable within the period of the rule against perpetuities. In the case of a charitable trust the beneficial interest is not given to individual beneficiaries, but the property is devoted *592 to the accomplishment of purposes which are beneficial or are supposed to be beneficial to the community, and the persons who are to receive benefits from the trust need not be designated. Scott on Trusts, Vol. IV. (2d Ed. 1956) § 364.
With reference to this requirement as to beneficiaries, the Chancellor found:
"This Court takes judicial notice that there are large numbers of poor boys and girls desirous of a college education, both in Bolivar County and elsewhere throughout this State and Nation; and that there are in Mississippi several colleges operated by various Christian denominations including the Methodist Church; and that the practice of establishing funds for sending needy children to college, both as loans and as outright grants, is a familiar practice."
We think that the decedent sufficiently described the class of beneficiaries to receive the provisions of her bounty.
The Chancery Court has the power and authority to appoint a trustee or trustees to manage the trust property, to direct them as to the method of selecting beneficiaries, and the distribution of the trust funds, and to otherwise administer the trust property.
The Chancellor was correct in ordering a sale of the 80 acres of farm land for the best price obtainable, and in providing for the payment of the two past-due indebtednesses against the farm land out of the proceeds of the sale. It is our opinion that the entire home property at Merigold, Mississippi, should also be sold for the best price obtainable, and the net proceeds of this sale along with the balance of the proceeds from the sale of the farm land, placed in a trust fund to be administered by a trustee or trustees appointed by the court and under the supervision of the court.
The primary, dominant and overriding intent of the decedent was to provide in her last will and testament not only the necessities of life, but the comforts also, for her half-niece and her half-sister. We think the Chancellor should invade the corpus of the trust fund, if necessary, to provide the necessities of life for Mrs. Henderson and Mrs. Waldrop on a monthly basis.
We affirm the judgment of the Chancellor in holding that the evidence was insufficient to establish a trust, constructive or otherwise, on the Harrison County lands. The fee simple title to such lands was conveyed to Mrs. Mary Bailey Hall by Mrs. Henderson by general warranty deed, dated November 25, 1942. The deed was promptly placed of record and there was no mention or disposition of these lands in the letter-wills. This property descended as intestate property to the heirs at law.
The judgment of the Chancery Court is affirmed, except that the Chancellor is not limited to the income from the trust properties in providing for the necessities of life for Mrs. Henderson and Mrs. Waldrop. He has the power and authority to invade the corpus of the trust fund in providing for their monthly needs. The income from all that remains in the trust fund after the death of Mrs. Henderson and Mrs. Waldrop will be administered by the Chancery Court to provide for the college education of poor boys and girls of Bolivar County, Mississippi, in a Methodist College in Mississippi in accordance with the provisions of the last will and testament of decedent.
The Judgment is, therefore, affirmed as modified.
Affirmed as modified.
ETHRIDGE, C.J., and RODGERS, PATTERSON and SMITH, JJ., concur.