521 So.2d 900 (1988)
BOARD OF TRUSTEES OF MONROE COUNTY BOARD OF EDUCATION
v.
Carl RYE and Wife, Gladys B. Rye; Federal Land Bank of New Orleans; Southern Royalty Company; Martha Rye Watkins; Winona Rye Freeman; Avonelle Rye Cole; Flora Nell Rye Dobbs; Neal Clement; Howard E. Stover; Esther Peeler Ledbetter; Dick L. Peeler; and J.W. Young, If Living, and If Deceased His Unknown Devisees or Heirs at Law and Board of Trustees of the Lowndes County Board of Education.
No. 57117.
Supreme Court of Mississippi.
March 2, 1988.
*901 Claude A. Chamberlin, Aberdeen, for appellant.
Henry J. Applewhite, Aberdeen, Michael Malski, Carnathan, Malski & Ford, Amory, for appellee.
EN BANC.
ROY NOBLE LEE, Chief Justice, for the court:
The Board of Trustees of Monroe County Board of Education filed suit in the Chancery Court of the First Judicial District of Monroe County against the defendants, appellees herein, who will be referred to as the Ryes for brevity. The purpose of this suit was to remove clouds and confirm title in the Board of Education on two hundred *902 (200) acres of land situated in Monroe County, Mississippi. The Ryes counterclaimed to remove clouds and confirm title in themselves. The chancellor dismissed the Board's complaint and entered judgment for the Ryes on their counterclaim, granting the relief prayed for, cancelling the claims asserted by the Monroe County Board of Education and holding that the Ryes were vested with good title to the lands. Aggrieved at the decision of the lower court, the Monroe County Board of Education appeals here.

Chain of Title
The land involved in this suit comprises 200 acres in Monroe County, Mississippi, described as
The E 1/2 of the SW 1/4, and the SE 1/4 of the NW 1/4, and the West 1/2 of the NE 1/4 of Section 21, Township 15 South, Range 17 West.
On March 7, 1855, the Swamp Land Commission of Monroe County, by its agent Dillingham, conveyed some 3,750 acres, including the subject property, to one James A. Sullivan in fee simple.
On May 8, 1867, Sullivan conveyed 442 acres of his original acquisition to the president of the Board of Trustees of the 15th Township south of Range 17 West, and to his successors in office, in trust for school use. That conveyance included the 200 acres of land which are the subject of this suit.
The record does not reflect any other conveyance of any part of the 442-acre tract until March 4, 1878, when the tax collector of Monroe County sold to one Ussery 120 of the 442 acres for delinquent taxes. The 120-acre tract is included in the subject property.
On April 21, 1879, Sullivan's executor filed a petition for the sale of lands owned by Sullivan at his death. Included in the sworn inventory of Sullivan's real property was all of the subject land.
On February 5, 1883, the Monroe County Board of Supervisors granted leases on the 442 acres. The 120-acre tract, including forty (40) acres of the subject property, was leased for a term of ninety-nine (99) years to one Rees. Another 200 acres, including one hundred sixty (160) acres of the subject property, were leased for a term of ninety-nine (99) years to Ussery, eighty (80) acres of which were already owned by Ussery in fee simple by virtue of the 1878 tax deed.
On October 15, 1885, twenty (20) acres of the subject property were sold to one Fitts for delinquent taxes. That tract was included in the 1878 Ussery tax deed and the 1883 Rees lease.
Title to the subject property passed to appellees Ryes in three separate parcels deraigned as follows:

PARCEL A

SE 1/4 of NW 1/4 of Section 21
This parcel was included in the 99-year lease given in 1883 to Rees by the Monroe County Board of Supervisors. A portion of this parcel (W 1/2 of the SE 1/4 of the NW 1/4) was also included in the 1885 Fitts tax deed. After Rees' death, the Chancery Court of Monroe County ordered the sale of this property to settle his estate. By a deed from the Clerk of the Chancery Court, the unexpired term of the Rees lease was sold in 1901 to F.L. Rye and P.R. Pool. In 1907, F.L. Rye sold his interest to Pool, but the deed covenanted a fee simple conveyance of the land. In 1911, Pool conveyed the land in fee simple back to F.L. Rye. In 1946, F.L. Rye's heirs conveyed the land to Willard Rye and Carl Rye. Finally, in 1961, Willard Rye's heirs conveyed to Carl and Gladys Rye. With the exception of the 1901 deed from the Clerk of the Chancery Court, all the deeds in this chain of title purport to convey fee simple estates, not leasehold estates.

PARCEL B

E 1/2 of SE 1/4 of Section 21
This parcel was included in the 99-year lease given in 1883 to Ussery by the Monroe County Board of Supervisors. A portion of this parcel (S 1/2 of the NE 1/4 of the SW 1/4) was also included in the 1885 Fitts tax deed. There is a gap in the chain of *903 title from 1883 until 1892. In 1892, this parcel was conveyed by one Mayfield to Booth. In 1906, Booth conveyed to I.W. and C.W. Rye. In 1908, C.W. Rye conveyed his interest to I.W. Rye. In 1915, I.W. Rye conveyed this parcel to Barton, less a 30-acre tract which I.W. Rye retained. In 1928, Barton conveyed the parcel, less the 30 acres, to Young. In 1928, Young gave a deed of trust covering this land to Leftwich. (This deed does not appear in the trial record.) In 1930, Leftwich foreclosed on the deed of trust and conveyed title to A.G. Rye. In 1939, A.G. Rye conveyed to Willard and Carl Rye. Finally, in 1961, Willard Rye's heirs conveyed the land to Carl and Gladys Rye.
In 1923, I.W. Rye gave a deed of trust covering his retained 30 acres to Jones, trustee for the Federal Land Bank of New Orleans. In 1933, the bank foreclosed on the deed of trust, and Jones conveyed title to the bank. In 1935, the bank conveyed to A.G. Rye. A.G. Rye then conveyed the 30 acres along with the rest of Parcel B in his 1939 conveyance to Willard Rye and Carl Rye.

PARCEL C

W 1/2 of the NE 1/4 of Section 21
This parcel was included in the 99-year lease given in 1883 to Ussery by the Monroe County Board of Supervisors. There is a gap in the chain of title from 1883 until 1892, when this parcel was conveyed along with Parcel B from Mayfield to Booth. Parcel C follows the same chain of title as Parcel B down through the 1908 conveyance from C.W. Rye to I.W. Rye. In 1921, I.W. Rye conveyed Parcel C to M.I. Rye. In 1922, M.I. Rye gave a deed of trust covering this parcel to Jones, trustee for the Federal Land Bank of New Orleans. (This deed does not appear in the trial record.) In 1933, the bank foreclosed on the deed of trust, and Houston, substituted trustee, conveyed title to the bank. In 1946, the bank conveyed to Willard and Carl Rye. Finally, in 1961, Willard Rye's heirs conveyed the land to Carl and Gladys Rye.

ISSUES
The lower court held that the Monroe County Board of Education, in 1867, was without authority to purchase or hold the land and, therefore, the 1867 conveyance to the school board was void. In the alternative, the lower court held that, assuming the validity of the 1867 conveyance, they had acquired title to the subject property by adverse possession against the school board. The Ryes also contend that their record title is made sound by the 1878 and 1885 tax deeds; and that the appellant is now barred by laches or is estopped from asserting its title to the subject property after one hundred (100) years have elapsed. The issues for discussion follow:
I.
DID THE BOARD OF TRUSTEES OF THE MONROE COUNTY SCHOOLS HAVE AUTHORITY IN 1867 TO ACQUIRE REAL PROPERTY?
II.
DID APPELLEES OR THEIR PREDECESSORS IN TITLE GAIN TITLE TO THE SUBJECT PROPERTY BY ADVERSE POSSESSION?
III.
DID THE PRIOR TAX SALES OF THE SUBJECT PROPERTY, TOGETHER WITH THE SUBSEQUENT PAYMENT OF PROPERTY TAXES THEREON BY APPELLEES, AFFECT THE VALIDITY OF APPELLANTS' TITLE?
IV.
DID THE FACT THAT APPELLEES HAD BEEN IN CONTINUOUS UNDISTURBED POSSESSION OF THE PROPERTY FOR OVER 35 YEARS BAR APPELLANT'S CLAIM UNDER EQUITABLE DOCTRINES OF LACHES OR ESTOPPEL?

I.  II.

DID THE BOARD OF TRUSTEES OF THE MONROE COUNTY SCHOOLS *904 HAVE AUTHORITY IN 1867 TO ACQUIRE REAL PROPERTY?

DID APPELLEES OR THEIR PREDECESSORS IN TITLE GAIN TITLE TO THE SUBJECT PROPERTY BY ADVERSE POSSESSION?
The lower court held that the school trustees lacked capacity to acquire and hold title, since they had no express or implied power to do so.
Since the judgment of the lower court will be affirmed for other reasons, we do not find it necessary to address this sticky issue in depth. The 1867 conveyance by Sullivan to the Board of Trustees is in the form of a trust. Even if the school board was without authority to acquire the subject land in 1867, the conveyance would still have been valid as a trust, i.e., the subject land was the corpus and the School System of Monroe County was the beneficiary. The school board's inability to serve as trustee would not have affected the validity of the trust, since a court of equity will not suffer a trust to fail for want of a trustee. Taylor v. Watkins, 13 So. 811 (Miss. 1893) [not reported in State reporter]; Skinner v. Harrison Township, 116 Ind. 139, 18 N.E. 529 (1888). See also McKinnon v. Gowan, 127 Miss. 545, 90 So. 243 (1922); Russell v. Town of Hickory, 135 Miss. 184, 99 So. 897 (1924); McInnis v. Board of Education of Madison County, 242 Miss. 412, 135 So.2d 180 (1961); Board of Education of Itawamba County v. Loague, 405 So.2d 122 (Miss. 1981); In Re Estate of Hall, 193 So.2d 587 (Miss. 1967); Magee v. Magee's Estate, 236 Miss. 572, 111 So.2d 394 (1959).
Therefore, it appears that the appellees are without grounds to challenge the effectiveness of the 1867 Sullivan conveyance to the Monroe County School Board.
The lower court alternatively decided that assuming, arguendo, the validity of the conveyance from Sullivan to the Monroe County Board of Education, the Ryes and their predecessors in chain of title acquired a good title by adverse possession.
The Mississippi Constitution of 1890 contains a provision immunizing the sovereign (state and subdivisions) against the bar of the statute of limitations, which includes the ten-year statutory period for adverse possession. Prior to 1890, there was no such provision protecting the State. Thus, in order to acquire title by adverse possession, there must have been adverse possession for a continuous period of ten years sometime between 1867 and 1890. Again, we do not attempt to determine on the record before us the acts of possession exercised by those persons in possession of the subject lands over 100 years ago and whether or not they were sufficient under the applicable principles of adverse possession law. As stated above, since the judgment will be affirmed for other reasons, we find it unnecessary to discuss this issue further.

III.

DID THE PRIOR TAX SALES OF THE SUBJECT PROPERTY, TOGETHER WITH THE SUBSEQUENT PAYMENT OF PROPERTY TAXES THEREON BY APPELLEES, AFFECT THE VALIDITY OF APPELLANTS' TITLE OF PRESUMPTION OF GRANT?
Under the facts of the instant case, we are of the opinion that there is a presumption that there was a legal liability on appellees and their predecessors in title to pay the taxes tendered over the years by them and, accordingly, there was a grant from the State sufficient to create such liability.

Effect of Tax Sales
The trustees of the Monroe County Board of Education were the record owners of the subject property in 1878 by virtue of the 1867 deed from Sullivan. On March 4, 1878, the land was sold for delinquent taxes. If valid title were in the Board of Education, the subject property was exempt from taxation at that time. Mississippi Code Annotated § 1662 (1871).[1]
*905 We look to the Mississippi Laws of 1877 for a clue as to why this land was sold for taxes. In 1877, the legislature established the position of State Commissioner of Swamp Lands to remedy a general condition of confusion regarding swamp lands patented to the State under the Federal Swamp Land Act of 1850, 1877 Miss. Laws, Ch. 14. The legislature noted that "it appears that the records of land sales now on file in the office of the Secretary of State are in an imperfect condition, showing repeated conflicting sales and selections, in many cases defaced, destroyed or lost... ." Id., Ch. § 2. This would tend to explain the evidence in the instant case that ownership of the subject property from 1870-78 was unknown.
The 1877 act authorized the Commissioner to "sell and dispose of" all unsold swamp land still retained by the State. Id., § 3. It was further provided that swamp lands sold by the Commissioner would "become subject to taxation as other lands are taxed." Id., Ch. 15, § 1 (emphasis added). The emphasized portion does nothing to diminish the public lands exemption of § 1662, Code of 1871. Therefore, if anything is implied by the tax sale of the subject property in 1878 immediately after the passage of the swamp land reform legislation, it is that the State Commissioner or the Monroe County Tax Collector concluded that the subject property was in private, not public, hands.
Determination of the effect of the 1878 tax sale on the validity of appellant's title raises a question of statutory construction. The validity of a tax sale is determined by the law in force at the time the sale was made. Beard v. Stanley, 218 Miss. 192, 67 So.2d 263 (1953). On March 4, 1878, tax sales were governed by § 1700, Code of 1871, as amended by Ch. 2 of the Laws of 1877. That statute provided that a tax sale vested in the purchaser
a perfect title to the land sold for taxes, and no such conveyance or list as between the original parties or subsequent alienees shall be invalidated, nor shall any defence be available against the title thus conveyed in any court of this State, except by proof that the taxes for which said lands were sold had been paid or tendered to the proper officer before sale, or that the taxes were illegal in part, and that before sale the tax-payer tendered to the proper officer the amount of legal taxes due on said lands.
1877 Miss. Laws Ch. 2, § 10.
The difficulty with this statute is in ascertaining what the legislature intended when it referred to tax sales "illegal in part." The tax sale in the instant case was probably illegal in that it constituted a sale of lands exempted from taxation by § 1662, Code of 1871. But whether this is the sort of illegality contemplated by the 1877 statute is unclear.
This same statute was amended by Ch. 6 of the Laws of 1880 and ultimately codified as § 525, Code of 1880. The amendment provided that to invalidate the title conveyed by a tax deed, there must be proof that "the land was not liable to sale for the taxes, or that the taxes for which the said land was sold, had been paid before sale; ..." § 525, Code of 1880 (emphasis added). The emphasized portion, had it been in effect in 1878, would have undoubtedly invalidated the tax sale in question, as the subject property was clearly not "liable to sale for the taxes." However, in a different and separate clause, the 1880 amendment goes on to restate the "illegal in part" language of its predecessor:
and, if any part of the taxes for which such land was sold was illegal or not chargeable on said land, but part was chargeable, that shall not affect such sale, nor invalidate such conveyance, unless it shall appear that, before such sale, the amount legally chargeable on such land was paid, or tendered to the tax collector.
§ 525, Code of 1880 (emphasis added).
This clause appears to explain that a tax sale "illegal in part" is one in which the *906 property was overassessed and sold for taxes where the owner pays the tax on the proper assessment but fails to pay on the over-assessment. As the 1880 legislature added a new clause invalidating tax sales of exempt property, and at the same time and in a separate clause retained the "illegal in part" terminology of the earlier version, the logical conclusion is that the legislature viewed the new clause as independent of the original clause and consequently that the 1880 amendment created a new and additional exception not within the contemplation of the 1887 statute. We therefore conclude that the 1878 tax sale of 120 acres of the subject property vested in the purchaser perfect title thereto.[2]

Effect of Subsequent Payment of Taxes and Presumption of Grant
The chancellor found that appellees "have been in exclusive possession of the subject land, paying taxes thereon, farming, cultivating and fencing said property for more than a period of thirty-five (35) years." This Court has held that continuous peaceable possession of land, when accompanied by the usual acts of ownership, will raise the presumption that the land has been granted to the possessor by the State, even where the claim is asserted against the State. Caruth v. Gillespie, 109 Miss. 679, 68 So. 927 (1915). Payment of taxes on land is considered an act of ownership in this context. Presley v. Haynes, 182 Miss. 44, 180 So. 71 (1938); Scarborough v. Native Lumber Co., 118 Miss. 138, 79 So. 84 (1918); Caruth v. Gillespie, supra.
This doctrine of presumption of grant is not precisely synonymous with adverse possession, though the two are "indissolubly linked." Gibson v. State Land Commissioner, 374 So.2d 212, 216 (Miss. 1979). Where adverse possession can be shown, the doctrine of presumption of grant has no application. Itawamba County v. Sheffield, 195 Miss. 359, 13 So.2d 649 (1943). The purpose of the doctrine is to quiet title after long possession; its applicability depends upon possession "under a claim of right, actual, open, and exclusive, and a chain of conveyances and payment of taxes are important." 4 Tiffany on Real Property, 3d ed., § 1136, n. 3 (1975) [citing United States v. Fullard-Leo, 331 U.S. 256, 67 S.Ct. 1287, 91 L.Ed. 1474 (1947)]. The greatest practical difference between adverse possession and the doctrine of presumption of grant is that the latter allows assertions of claims against the sovereign, despite statutes barring adverse possession against the State. 5 Thompson on Real Property, § 2540A (1979) [citing Carruth v. Gillespie, supra]. It is readily apparent, then, that application of the doctrine of presumption of grant to the facts of the instant case is especially appropriate.
In Presley v. Haynes, 182 Miss. 44, 180 So. 71 (1938), Haynes conveyed certain land to Presley who in turn conveyed to a third party. When the third party discovered that the chain of title depended upon two 1887 tax deeds which were void, he required Presley to quiet title by procurement of a state patent. Presley sought indemnity from Haynes pursuant to the warranties in the deed from Haynes to Presley. Haynes and his predecessors in title had been in open possession of the land and had paid taxes thereon for over 45 years before the conveyance to Presley. Concluding that Haynes was not liable on his warranty, this Court held that the doctrine of presumption of grant cured any remote defect in the chain of title:
Under such circumstances, and because of such a long lapse of years, it will be presumed that the state has long ago conveyed to the said occupants all its title to the land by a valid patent or patents, other than the invalid patents to which appellant here points... .

*907 When continuous occupancy, possession, and use of land has been openly held for such a great length of time as shown in this case, the state receiving taxes assessed thereon as if privately owned, the presumption above mentioned becomes absolute, and the title will be deemed as perfect as if held against private owners for the 10 years prescribed by the adverse possession statute, section 2287, Code 1930, which, under its express terms, gives full and complete title.
182 Miss. at 49-50, 180 So. at 71-72.
Even though we think that the tax deed in the instant case was valid, Presley clearly demonstrates that presumption of grant will cure even a void tax deed under the proper circumstances.
A title problem similar to the one now before the Court was resolved in Jones v. Gulf Refining Co., 202 Miss. 705, 32 So.2d 435 (1947). There, the State, as a party in interest, sought to confirm title in itself to land which Jones and his predecessors, claiming under an 1875 tax deed, had continuously occupied for 66 years. The State argued that because there was no evidence the land had ever been patented to a private owner, title was still in the State in 1875 and consequently, the land could not possibly have been sold for taxes then. Regardless of whether title was actually in the State in 1875, this Court invoked the doctrine of presumption of grant to dispel the confusion:
In order that the forfeited tax-land patent shall have been good to convey a fee-simple title, a title of that grade must have passed out of the state into the hands of a private person before January 1, 1874, else it would not have been assessable and subject to the tax sale as a fee-simple title on May 10, 1875. There is no record that the title had so passed out of the State. In favor, however, of a possession of such a long length of years as is here present, a presumption exists that there was such a grant by the sovereign as will support the title of the persons in actual adverse occupancy and claim of title.
202 Miss. at 709, 32 So.2d at 436.
The same principle is applicable to the facts of the instant case. There is no evidence that the school board ever parted with the title it acquired from Sullivan in 1867. But title must have passed from the school board to a private person prior to the 1878 tax sale, else the property would not have been subject to such a sale. The open and continuous possession of the subject property by appellees and their predecessors for the previous 93 years (1892-1985), is enough to raise a presumption that there was at some time a grant from the sovereign sufficient to support the title they now assert.
This Court has recently addressed the doctrine of presumption of grant in Gibson v. State Land Commissioner, 374 So.2d 212 (Miss. 1979). That opinion as it relates to presumption of grant is not clear. Gibson appears to mean that presumption of grant will not arise against the State unless the claimant produces "written evidence" of some kind from the State to impart color of title (374 So.2d at 217.) If this is the rule in Gibson, then such a rule is erroneous, since the very purpose of the doctrine is to remedy the absence of written evidence of some kind from the State. Notwithstanding the requirement in Gibson, that case poses no obstacle to appellees. The written evidence from the State which imparts color of title to appellees' claim is the 1878 tax deed from the State wherein the subject property is conveyed to the purchaser, "his heirs and assigns forever."
A final question which arises in connection with this issue is whether a prior tax sale is necessary to invoke the doctrine against the State. This question is particularly relevant to the instant case in that part of the subject property (Parcel C, W 1/2 of NE 1/4) was never sold for taxes as were the other two parcels.
Jones v. Gulf Refining Co. and Presley v. Haynes suggest that there must be some triggering event in the chain of title (e.g., tax sale of public land) to raise the presumption *908 of grant. This appears to be the force behind the implication in Gibson v. State Land Commissioner that a presumption of grant will not arise unless there is shown some "written evidence" from the State imparting color of title.
What these cases stand for is the principle that a presumption of grant arises where there is some unexplained anomaly in the chain of title. But this principle should not be construed to mean that the presumption arises only in the face of such anomaly. The Supreme Court of Arkansas has held that the lack of defect in the chain of title does not preclude the application of the presumption where the claimant has openly occupied the land and paid the taxes thereon for a long period. Miller v. Kansas City Southern Rwy. Co., 216 Ark. 304, 225 S.W.2d 18 (1949); Carter v. Stewart, 149 Ark. 189, 231 S.W. 887 (1921). Surely the State cannot "undertake to profit because of the negative nature of the records." Miller, 216 Ark. at 306, 225 S.W.2d at 19.
[W]here the State has for a long time demanded and collected taxes on property, and the property owner [claimant] has acquiesced therein by paying the taxes, there arises a presumption that there was a legal liability to pay the taxes, and this furnishes a strong circumstance from which the court may infer a grant from the State.
Carter, 149 Ark. at 195, 231 S.W. at 889. See generally Baker v. Certain Lands in Independence County, 19 Ark. App. 253, 750 S.W.2d 318 (1986).
In summary, we conclude that the 1878 tax deed vested perfect title in the purchaser. But even if the 1878 tax sale was void, we hold that the open and continuous possession of the subject property by the Ryes and their predecessors in title from 1892 to the present, together with the usual acts incident to ownership, is sufficient under Mississippi law to raise the presumption that at some time there was a grant by the sovereign which divested itself of title and perfected title in those from whom the Ryes now deraign their title.

IV.

DID THE FACT THAT APPELLEES HAD BEEN IN CONTINUOUS UNDISTURBED POSSESSION OF THE PROPERTY FOR OVER 35 YEARS BAR APPELLANTS' CLAIM UNDER EQUITABLE DOCTRINES OF LACHES OR ESTOPPEL?
The Ryes acquired possession of Parcel B of the subject property in 1939 and possession of Parcels A and C in 1946. Since those dates and up to the present, the Ryes have made their home on the subject property, have fenced it, farmed it, executed oil, gas and mineral leases thereon, run cattle upon it, cut timber and trees from it, cleared it, paid taxes upon it, and have exercised every known and conceivable act of ownership imaginable for fee simple property. Most importantly, they have built their home upon it and have nurtured and reared their family members upon it, exercising all privileges and rights of honest, law-abiding citizens in the community, contributing to the advancement and well-being of Monroe County, Mississippi. Their title, through their predecessors, in unbroken chain runs backward to 1892, a continuous line of ninety-three (93) years. The chancellor emphasized the equities favoring the Ryes, counter-plaintiffs, finding:
Considering all the facts, a great injustice would be done to the Counter-Plaintiffs to take their land and leave them nothing to show for their labors and investment in home and farm. After all these many years have passed with the county not even knowing of any possible claim it might have to this property, to have these Counter-Plaintiffs to lose their property would be inequitable, unjust and unfair to the extent it would shock the conscience of this Court.
We recognize that the State is not responsible for the laches of its officers. Alexander v. Mayor and Board of Aldermen of City of Natchez, 219 Miss. 78, 68 So.2d 434 (1953). However, the application of the doctrine of equitable estoppel is otherwise. The State, its counties, subdivisions and municipalities may be equitably estopped under the proper circumstances. *909 Suggs v. Town of Caledonia, 470 So.2d 1055 (Miss. 1985); Covington County v. Page, 456 So.2d 739 (Miss. 1984); State v. Stockett, 249 So.2d 388 (Miss. 1971).
The facts of Covington County v. Page, supra, are similar to those of the case sub judice. There, a private party conveyed certain lands to the county in 1911. A year following this conveyance, at a time when the land was clearly exempt from taxation by virtue of the county's ownership, the land was sold for ad valorem taxes without explanation. In 1940, the county gave a quitclaim deed to the successors of the tax sale purchaser in order to remove any clouds suggested by the questionable tax sale. In 1975, the county purported to give a mineral lease on the land, and Page, successor of the tax sale purchaser, sued to confirm title in himself. This Court held that the county was estopped to assert title at this late date. The Court said:
Considering the actions of the board of supervisors in giving a quitclaim deed to J.T. Knight and collecting ad valorem property taxes from Knight and his successors in title, this is an appropriate case to raise the shield of estoppel. The county ignored whatever title it may have had and assessed and collected taxes on the property from 1911 through 1982, the date of the lower court hearing... . The collection of taxes and the signing of the deed are affirmative actions of the county which give rise to equitable estoppel in this case.
456 So.2d at 742.
In the Covington County case, the quitclaim deed was a primary factor upon which the Court relied in its application of equitable estoppel against the county. However, the Court also emphasized the county's acceptance of taxes on the land as a material contributing factor. Indeed, the Court stated that by assessing and collecting the ad valorem taxes, the county ignored whatever title it might have had. The same can be said for Monroe County in the present case.
As previously discussed, payment of taxes on the subject property by the Ryes and the county's acceptance thereof are important to the application of the doctrine of presumption of grant under the facts of this case. Similarly, Covington County shows that the payment of taxes goes to the equities of the case. Thus, the doctrine of presumption of grant and equitable estoppel have a complementary effect when applied to the Ryes' situation. Without question, the equities of the case at bar overwhelmingly favor the Ryes.

CONCLUSION
The subject property came into possession of appellees Ryes in three separate parcels. Since each parcel is deraigned to appellees through separate chains of title, the doctrine of presumption of grant and the equitable considerations attendant thereto must be applied to each parcel separately.

PARCEL A

SE 1/4 of NW 1/4 of Section 21
This parcel was included in the 1878 tax sale. The doctrine raises the presumption that the school board conveyed title to this parcel prior to the tax sale. Jones v. Gulf Refining Co., 202 Miss. 705, 32 So.2d 435 (1947). Thus, the 1883 lease of Parcel A to Rees was of no effect, since the county is presumed to have had no interest to convey at that time. Record title to Parcel A in 1883 would have been in Ussery, the purchaser at the 1878 tax sale. Although appellees trace their chain of title to this parcel directly to the Rees estate, the first record conveyance of Parcel A in fee is from F.L. Rye to P.R. Pool in 1907. Under these circumstances the doctrine operates to presume a grant from Ussery to F.L. Rye sometime between 1878 and 1907. Scarborough v. Native Lbr. Co., 118 Miss. 138, 79 So. 84 (1918). Thus, title to the SE 1/4 of the NW 1/4 of Section 21 is perfected in appellees.

PARCEL B

E 1/2 of SW 1/4 of Section 21
This parcel was included in the 1878 tax sale and was leased to Ussery by the county *910 in 1883. As with the Rees lease, the Ussery lease was of no effect since the county had no interest to convey, there having been a presumed grant from the State to a private individual prior to the 1878 tax sale. Jones, supra. In fact, Ussery, the purchaser at the 1878 tax sale, was himself record owner of Parcel B in 1883. Why he would buy a lease to land he already owned in fee simple is but one of the many curiosities of this case. In 1885, Fitts purchased 20 acres of this parcel (S 1/2 of NE 1/4 of SW 1/4) for delinquent taxes. Thus, in 1885 record title to Parcel B was in Ussery (60 acres: N 1/2 of NE 1/4 of SW 1/4 and SE 1/4 of SW 1/4) and Fitts (20 acres: S 1/2 of NE 1/4 of SW 1/4). There is a gap in the chain of title from 1885 to 1892, when Mayfield conveyed all of Parcel B to Booth. Appellees trace their chain of title directly to Mayfield. Under these circumstances, the doctrine presumes grants from Ussery and Fitts to Mayfield sometime between 1885 and 1892. Scarborough, supra. Thus, title to the E 1/2 of the SW 1/4 of Section 21 is perfected in appellees.

PARCEL C

W 1/2 of NE 1/4 of Section 21
This parcel was leased to Ussery by the county in 1883. Unlike Parcels A and B, Parcel C was not the subject of any tax sale from the time it was acquired by the school board in 1867 until its lease to Ussery in 1883. The chain of title to Parcel C is very simply Swamp Land Commission to Sullivan to school board, with the school board giving to Ussery a lease expiring in 1982. Appellees' chain of title to Parcel C begins with the same 1892 Mayfield-to-Booth deed which also conveyed Parcel B. There is no event in the school board's chain of title to raise the presumption of grant as it is raised in Jones, supra, and Presley v. Haynes, supra. However, the State's collection of taxes on the subject property and the payment thereof by appellees and their predecessors in title over a period of 93 years is sufficient to raise the presumption that there was a legal liability to pay the taxes and, therefore, a further presumption that the property was at some point granted by the State to private owners preceding appellees in their chain of title. Carter v. Stewart, 149 Ark. 189, 231 S.W. 887 (1921). Thus, title to the W 1/2 of the NE 1/4 of Section 21 is perfected in appellees.
As stated hereinabove, the chancellor decided the issues in favor of appellees Ryes on two propositions, i.e., (1) trustees of the Monroe County Board of Education had no authority to acquire property in 1867 for school purposes, and (2) appellees' predecessors in title acquired title to the property by adverse possession prior to 1890. Since we decide the issues on other grounds, we do not address those points upon which the lower court grounded its decision.
Assuming that the chancellor erred in his holding, nevertheless he ordered that title to all of the subject property be confirmed in appellees Ryes. Therefore, under the facts and the law of the case, he reached the correct result. When the chancellor reaches the correct result, though for the wrong reason, this Court will affirm the judgment entered. Estate of Johnson v. Adkins, 513 So.2d 922 (Miss. 1987); Tedford v. Dempsey, 437 So.2d 410 (Miss. 1983).
The judgment of the lower court is affirmed.
AFFIRMED.
HAWKINS and DAN M. LEE, P.JJ., and ANDERSON and GRIFFIN, JJ., concur.
ROBERTSON, PRATHER, SULLIVAN and ZUCCARO, dissent.
ROBERTSON, Justice, dissenting:

I.
The Court today confirms private title to lands I find impressed with a trust for the benefit of the school children of Monroe County. In 1867 these twenty-first section lands were conveyed in trust to county school authorities. Employing the familiar and analogous procedures for handling lands subject to the federally created school lands trust, Monroe County authorities in 1883 leased these lands for ninety-nine *911 years. Those leases expired in February of 1982. I would confirm title in the school board as trustees, for in law it there resides and in equity there exists no interest more powerful than our children's education. As the majority holds otherwise, I respectfully dissent.

II.
The controlling facts  undisputed by the majority  are these: On March 7, 1855, James Dillingham, Swampland Commissioner of Monroe County, conveyed substantial acreage to one James A. Sullivan. Included in this conveyance was the 200-acre tract here at issue.
On May 8, 1867  twelve years and a war later  Sullivan conveyed the property to "Albert Dale, President of the Board of Trustees of the Fifteenth Township South of Range 17 West, and his successors in office, and for the use and benefit of the citizens of the Fifteenth Township for schools."
On December 5, 1882, the Board of Supervisors of Monroe County ordered an appraisal of the subject tract. Miss.Rev.Code § 732 (1880). This appraisal was accepted on January 3, 1883, whereupon the Board entered an order directing the Clerk to lease the lands to the highest bidder, all in accordance with procedures then found in Miss.Rev.Code §§ 732 and 733 (1880).
On February 5, 1883, the Clerk of the Board of Supervisors entered into two ninety-nine year leases. In the first, 160 acres of the subject 200-acre tract was leased to W.M. Ussery. The second was a lease of the remaining 40 acres to William Reese. See Miss.Rev.Code §§ 732 and 733 (1880).
On February 5, 1982, the two 99-year leases expired. On August 9, 1984, the Board of Trustees of the Monroe County Board of Education commenced this civil action to cancel claims and remove clouds from their title. They are entitled to the relief prayed for. I would reverse and render.

III.
Today's majority, and as well as the court below, have made much of the fact that the Ryes have been paying taxes on the land "for more than a period of thirty-five (35) years." The point proves nothing. Though these lands are not Sixteenth Section lands, nor insofar as the record reflects, are they "lieu lands" either, county and school authorities in Monroe County have at all times dealt with the lands as school lands. I say this to say that a lessee's payment of taxes on lands subject to the school lands trust is a practice that has been around for more than sixty years. See Turney v. Marion County Board of Education, 481 So.2d 770, 782-83 (Miss. 1985); Miss. Code Ann. §§ 29-3-71 and -73 (1972 and Supp. 1987); Miss. Laws, ch. 443, § 14 (1946); Miss. Laws, ch. 267 (1924). The evidence of tax payments is wholly consistent with the school board's premise that these lands have been school lands since 1867.

IV.
The court below found for the Ryes on two theories: (1) school authorities had no legal power to acquire and hold these lands and, alternatively, (2) adverse possession. Sensing that neither of these notions holds water, the majority offers three new theories upon which it would save these lands for the Ryes. Upon scrutiny each is seen at best a well-intentioned nice try.

A.
First, with respect to 120 acres, we are told that a March 4, 1878, tax sale to William Ussery "vested in the purchaser [William Ussery, a/k/a W.M. Ussery] perfect title thereto." Yet at that time, record title was vested in the Monroe County School Trustees by virtue of the 1867 deed from Sullivan, a point the majority concedes. As such, the property was exempt from taxation at that time, Miss.Rev.Code § 1662 (1871), and a tax sale conveyed no title. Hewling v. Blake, 110 Miss. 225, 239-40, 70 So. 247, 249 (1915). The 1878 tax sale was a mistake without legal effect. That it conveyed nothing is established most eloquently by Ussery's February 1883 procuring of a ninety-nine year lease. If Ussery *912 had thought the tax deed he acquired on March 4, 1878, were worth the paper it was written on, why would he go to the trouble to obtain a ninety-nine year lease five years later? The question answers itself.

B.
The majority's second nice try is its effort to erect a presumption of grant, a notion all of the cases say must turn on (a) some missing or incomplete grant and (b) continuous peaceable possession accompanied by acts of ownership, etc. But what is missing? In 1867 Sullivan conveyed in trust for the schools. In 1883 the Board of Supervisors granted two ninety-nine year leases for the benefit of the schools. In February of 1982 these leases expired. Where is the "unexplained anomaly in the chain of title"? Answer: there is none!

C.
Third, the majority invokes equitable estoppel to bar the school board's suit. Assuming arguendo that the county can lose lands it holds in trust for the schools via equitable estoppel, what has the Monroe County School Board done to estop itself? Until February 5, 1982, it had no authority to do anything by virtue of the ninety-nine year leases. The Ryes entered upon a portion of the property in 1939 and the remainder in 1946. To be sure, they have since used it, fenced it, farmed it, executed oil and gas leases, cut timber, etc. and, I dare say, so did practically every other one of this state's many ninety-nine year lease-holders. In law the school board had no authority to interfere until February of 1982. And, as we have noted above, payment of taxes amounts to nothing.

V.
The Chancery Court decided this case in favor of the Ryes on alternative theories, neither of which are accepted by the majority. In the first place, the majority is entirely correct in recognizing that the 1867 deed was a conveyance in trust and as such may not fail for want of a properly qualified trustee. The Chancery Court's alternative theory was that the school trustees had lost title to the Ryes via adverse possession. The reasons why this holding was erroneous are implied in what we have said above. Still, further discussion is appropriate.
The argument here is really a defense of laches, to-wit: that the school board is charged with knowledge of the presence of the various clouds upon their title for a substantial period of time  almost a century  and that they sat by and did nothing until the filing of this suit on August 9, 1984.
The principle that a governmental entity is not responsible for the laches of its officers is well established in our law. Alexander v. Mayor and Board of Aldermen of City of Natchez, 219 Miss. 78, 94, 68 So.2d 434, 441 (1953); Aetna Insurance Co. v. Robertson, 131 Miss. 343, 377, 94 So. 7, 10 (1922); see also Chill v. Mississippi Hospital Reimbursement Commission, 429 So.2d 574, 585 (Miss. 1983); City of Bay St. Louis v. Hancock County, 80 Miss. 364, 371-72, 32 So. 54 (1902). This principle's presence in our law predates the 1890 Constitution. Josselyn v. Stone, 28 Miss. (6 Cushm.) 753, 763 (1855).
The contours of the point are shaped by our Constitution which in relevant part provides:
Statutes of limitation in the civil causes shall not run against the state, or any subdivision or municipal corporation thereof.
Miss. Const., § 104 (1890). Accordingly, any statute of limitations for adverse possession does not run against the school board of trustees. See Board of Education of Itawamba County, MS v. Loague, 405 So.2d 122, 124-25 (Miss. 1981); Gibson v. State Land Commissioner, 374 So.2d 212, 217 (Miss. 1979); see also Cinque Bambini Partnership, Inc. v. State, 491 So.2d 508, 521 (Miss. 1986) (state's title can never be lost via adverse possession or limitations) (cases collected therein).[1]
*913 Section 104 became effective on November 1, 1890. The temporal contours of the Ryes' adverse possession claim, therefore, begins with the Sullivan deed of May 8, 1867, and extends through November 1, 1890. If the Ryes could prove adverse possession by their predecessors in title for any continuous ten year period between those two dates, they would prevail. This scenario is made possible by Warren County v. Lamkin, 93 Miss. 123, 46 So. 497 (1908), upon which the Chancery Court here relied in making its ruling. That case was an action of ejectment by the county against a subsequent possessor, Lamkin, of a portion of land conveyed to the county by the Board of Police in 1840. 93 Miss. at 162, 46 So. at 511-12. At issue was whether the ten-year statute of limitations for adverse possession applied against the county to bar its claim. 93 Miss. at 161, 163, 46 So. at 511, 512. The court noted that beginning with the Constitution of 1890, statutes of limitations ceased to run against counties and cities whereas prior thereto, such statutes ran against counties and cities. 93 Miss. at 165, 46 So. at 513. However, the court held that the right to the property in that particular case was governed by the statute of limitations in effect at the time of the original conveyance, which was before the Constitution of 1890 took effect. 93 Miss. at 165, 46 So. at 513.
The party asserting adverse possession has the burden of proving possession which is (1) open, notorious and visible; (2) hostile; (3) under claim of ownership; (4) exclusive; (5) peaceful; and (6) continuous and uninterrupted. Roy v. Kayser, 501 So.2d 1110, 1111 (Miss. 1987) (cases collected therein). This exclusive possession must be shown for a period of ten years. Davis v. Davis, 508 So.2d 1062, 1065 (Miss. 1987); Miss. Code Ann. § 15-1-13 (1972). Our concern is the legal sufficiency of the evidence to establish each of these elements of adverse possession for any ten year period between May 8, 1867, and November 1, 1890.
Assuming that the ten year period of adverse possession the Ryes claim their predecessors in title enjoyed had to have ended before November 1, 1890, it must have begun before November 1, 1880. Equally as difficult as when the adverse possession began is identification of the person or persons said to have possessed the land adversely. There are three possible adverse possessors  the Mayfields and/or W.M. Ussery and/or the original grantor, James A. Sullivan. Even if we may assume that D.M. Mayfield and A.E. Mayfield possessed the property prior to their October 28, 1892, conveyance to the Boothes, there is nothing in the record reflecting the date the Mayfields' possession began, much less that it met the other requisites of adverse possession recited above.
The claim is equally problematic if William Ussery a/k/a W.M. Ussery is the adverse possessor. The Ryes claim that Ussery took title via the tax sale of March 4, 1878, and entered into possession thereafter. The ninety-nine year lease Ussery acquired February 5, 1883, suggests the lands were treated as school lands. There is nothing in the record suggesting that, prior to 1890, Ussery put these lands to any use inconsistent with his status as a lessee. Moreover, there is nothing to suggest that Ussery asserted any dominion over the remaining forty acres as those were leased to William Reese for ninety-nine years. It is within the judicial knowledge of this Court that lands leased by a board of supervisors during this period of time to a private individual for a period of ninety-nine years were considered by the lessor board of supervisors to be lands held in trust for the public schools.
Thus seen, the Ryes' adverse possession argument simply fails. There is no getting around the fact that the Chancery Court's ruling in favor of the Ryes in this regard is clearly erroneous. Here, of course, I beat a dead horse, as the majority makes no attempt to defend the Chancery Court's *914 reasoning, only its result. With respect, I suggest that result may be defended neither on grounds offered by today's majority nor those of the court below nor on any other that might be imagined.
PRATHER, SULLIVAN and ZUCCARO, JJ., join in this opinion.
NOTES
[1] The subject property was not 16th section land, nor was it lieu land. This sale is distinguished from tax sale of 16th section lands and cases discussing such sales. Burrage v. Lauderdale County, 245 So.2d 842 (Miss. 1971); Creekmore v. Neshoba County, 216 Miss. 589, 63 So.2d 45 (1953); Sumrall v. State, 48 So.2d 502 (1950).
[2] This discussion does not overlook Hewling v. Blake, 110 Miss. 225, 70 So. 247 (1915), wherein the Court stated than an 1867 tax sale of exempt property conveyed no title because exempt property was not subject to sale for taxes. Hewling is distinguished in that it was not decided under the tax sale statute, nor was the tax sale statute argued in the briefs.

Further, the validity of the 1885 tax sale of the subject property is not an issue. All of the property sold for taxes in 1885 had previously been sold in the 1878 tax sale.
[1] Just how equitable estoppel of public officials and agencies may on principle co-exist with preclusion of laches and limitations defenses is not apparent. Some day soon we should resolve the point.